COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, | § | No. 08-14-00148-CV |
| | § | |
| Appellant, | § | Appeal from the |
| | § | |
| v. | § | 120th District Court |
| | § | |
| NORMA PARRA, | § | of El Paso County, Texas |
| | § | |
| Appellee. | § | (TC#2009-1677) |
| | § | |

# **O P I N I O N**

Texas Department of Family and Protective Services (TDFPS) appeals from a judgment following a jury verdict that TDFPS terminated Norma Parra in retaliation for filing a workers' compensation claim. TDFPS raises three issues on appeal: (1) whether the State waived its sovereign immunity from Parra's claim; (2) whether the trial court erroneously charged the jury on damages; and (3) whether Parra presented sufficient evidence to support her wrongful termination claim. We affirm.

## **FACTUAL BACKGROUND**

TDFPS hired Parra in 2006 as a case worker assistant. As part of her job, Parra was required to perform home visits to families and to transport children and their families to various appointments. On January 28, 2008, Parra was driving her car to a home visit when she was hit

by another vehicle while stopped at a traffic light. Parra injured her head, neck, and back in the accident. As required by TDFPS policy, Parra immediately contacted her supervisor, Theresa Santaguida, and advised Santaguida that she had been in an accident and would be unable to complete the home visit. Parra went to the emergency room where she was given prescription medication for her injuries and advised to follow up with her personal physician. The orthopedic doctor who initially treated Parra ordered her to physical therapy and directed her not return to work until she completed physical therapy.

Santaguida testified that she twice attempted to forward a report regarding Parra's accident to TDFPS Human Resources (HR) division, as required by TDFPS policy first on January 28, 2008 and then on February 8, 2008. However, the report was never received by the HR division. Santaguida testified she did not forward information concerning Parra's accident to TDFPS's insurance carrier, the State Office of Risk Management (SORM), which would have initiated a workers' compensation claim on Parra's behalf, because she was not aware it was her responsibility to do so.

Consequently, Parra was not informed that state policy allowed her to make a choice, within five days of her accident, either to begin utilizing her accrued sick leave and accrued annual leave while she was off work, or alternatively to be placed on workers' compensation status, which would have preserved her leave time.[1] Instead, Parra began utilizing her accrued leave, which expired on March 13, 2008. TDFPS also placed Parra on leave pursuant to the Family Medical

---

[1] A state employee may elect to use their accrued sick leave, and when that is exhausted may elect to use all or part of their accrued annual leave, before they start receiving workers' compensation income benefits. TEX. LABOR CODE ANN. § 501.044 (West 2015). If an employee elects to use their accrued leave, they are not entitled to income benefits until their sick leave and the elected annual leave have been exhausted. *Id.*

Leave Act. Under TDFPS policy, Parra was required to exhaust all her accrued leave before going on the unpaid leave under the FMLA, since at the time she not was receiving workers' compensation benefits.

Shortly before her accrued leave expired, Parra realized that Santaguida had failed to report her accident and that a workers' compensation claim had not been opened on her behalf. On March 7, 2008, Parra reported the accident to the Texas Department of Insurance,[2] which in turn forwarded the information to SORM. Thereafter, a SORM claims examiner, Beckie Zientara, forwarded the information to Howard Lang, an operations manager for G and H Partners, the third-party administrator who handles workers' compensation claims for TDFPS.

When Lang received the information regarding Parra's claim, he immediately contacted Santaguida and asked her to forward information regarding Parra's accident so that he could open up Parra's workers' compensation claim. Lang expressed concern that Parra had not been given the option to make an election of benefits, as required by state policy, which would have allowed Parra to be placed on workers' compensation status immediately after her accident rather than utilizing her own accrued leave while she was receiving treatment for her injuries. Lang also realized that state policy required an employee to be placed on workers' compensation status within five days of her accident if a timely election was not made. He therefore informed Santaguida that due to Parra's failure to make a timely election, it was possible that Santaguida would be required to place Parra on workers' compensation status retroactively and reinstate all of her accrued leave.

---

[2] The Texas Department of Insurance is the state agency that houses the Texas Division of Workers' Compensation.

3

At the same time, Lang also contacted Zientara, and suggested the possibility that Parra be given the opportunity to make a late election of benefits, in light of the delays that occurred in reporting her accident. TDFPS policy did not allow a late election of benefits. Thereafter, on March 19, 2008, an unidentified supervisor at SORM made the determination to deviate from policy and to allow Parra to make an election after the five-day time period had expired.

Parra was then given a copy of the form, known as a SORM-80 Form, which should have been given to Parra immediately after the accident, requiring her to elect between utilizing her own accrued leave, or alternatively, being placed on workers' compensation status. Lang testified that if Parra had made an election to be placed on workers' compensation status retroactively to the date of her accident, the agency would have been required to reinstate her accrued leave time. Parra testified that no one explained to her why she was being given the form almost two months after her accident, when her accrued leave had already been exhausted. She further testified she was never told of the possibility of having her leave reinstated. Instead, when she received the form, Parra believed she was required to select the option for utilizing her own accrued leave, because she had already utilized that leave. Neither Lang nor Santaguida, who ultimately provided the election form to Parra, could recall explaining to Parra why she was being given the election form after she had already utilized her accrued leave, or informing her of the possibility that her leave could have been reinstated at that point. The instructions for the election form

required it to be completed by both the employee and a "claims coordinator," and required that certain explanations be provided to the employee.[3]

After Parra elected to utilize her leave time, as she believed she was required to do, Lang, who apparently did not realize that Parra's leave had already been exhausted, sent a follow-up communication to Santaguida, advising her that Parra should be placed on leave without pay once Parra utilized all of her accrued leave in accordance with her option selection. Lang also advised Santaguida to notify him if Parra either returned to work or if her termination occurred. Because Parra elected to utilize her already-exhausted leave, Parra's leave was never reinstated. Parra was left on FMLA leave until April 28, 2008, when her mandatory 12-week FMLA leave expired. She was then placed on worker's compensation leave without pay, until her termination in July 2008.[4]

---

[3] On March 19, 2008, an employee in Lang's office attempted to send an e-mail to Parra's personal e-mail address, with a copy of the election form attached. The e-mail advised that Parra was required to make an election so that the office would know when to put Parra on workers' compensation benefits. The e-mail provided no explanation why Parra was being asked to make this election at such a late date, after she had already exhausted all of her leave benefits. It also did not explain that Parra would be entitled to have her leave reinstated if she chose the second option or the significance of making the election. Lang testified that he did not believe that anyone from his office would have explained to Parra the significance of making this choice, as he did not believe it was the responsibility of his office to do so. In his opinion, that duty would have fallen on Parra's supervisor, because the injured employee's supervisor is considered the "go between" for the employee and his office, and his office had very little, if any, direct contact with the injured employee. Upon receiving a copy of the e-mail, Santaguida sent a message to Lang's office that same day, advising that Parra did not have access to e-mail, and that she would make sure that Parra received the form. Santaguida thereafter provided the form to Parra. Santaguida testified that she did not believe it was her role to ensure that Parra made the correct choice on the form.

[4] Lang had instructed Santaguida on March 19, 2008, to place Parra on leave without pay and on workers' compensation status when her accrued leave was exhausted, thereby entitling her to receive only the equivalent of 70 percent of her pay through the workers' compensation benefits, rather than her full paycheck. Parra, however, was mistakenly given her full paychecks for March and April. Although the record contains a notice to Santaguida regarding the overpayment, it is unclear how that issue was resolved.

Before Parra's termination in July, Santaguida made two unsuccessful requests to the Health and Human Services' Time, Labor, and Leave Division ("TLL"), first on March 18, 2008, and again on May 6, 2008, for Parra to be given an unspecified number of hours of extended sick leave (ESL) or sick leave pool (SLP) hours.[5]   If granted, this would have entitled Parra to receive her full paycheck, rather than only 70 percent of her pay through workers' compensation benefits, which she was entitled to receive while on workers' compensation leave status.   However, those requests were both denied because Santaguida failed to provide the TLL office with adequate medical documentation.

In the meantime, while her second request for extended leave was still pending, Parra retained an attorney to assist her with her workers' compensation claim.   As early as May 1, 2008, her attorney began faxing information to Santaguida regarding Parra's medical status.   All the reports indicated that Parra's treating physician was continuing to keep her off work pending additional work-conditioning therapy during June and July.

A month after learning that Parra had retained an attorney, and while her second request for extended leave was still pending with the TLL office, Santaguida began contacting other agency employees requesting advice on whether she could terminate Parra.   Santaguida sent a memo dated June 5, 2008 to an HHSC employee, Amy Boyce, advising Boyce that Parra had been on leave without pay since April 28, 2008 "when her FMLA leave ran out" and that she was in need of a "full-time tech" for her unit, and asking if it would be permissible to replace Parra.   In her memo, Santaguida did not mention that Parra had been injured in a work-related accident, that

_____

[5] The Health and Human Services Commission oversees the Texas Health and Human Services system, which is composed of five state agencies, including TDFPS.

6

Parra was receiving workers' compensation benefits, or that her second request for ESL/SLP leave was still pending. Boyce advised Santaguida not to terminate Parra.

During this same time period, at the request of the Division of Workers' Compensation, Parra was evaluated by a designated doctor, Dr. Ajay Mohabeer, who released Parra to return to work effective June 13, 2008, with a 25-pound lifting restriction.[6] Dr. Mohabeer filled out a Texas Workers' Compensation Work Status Report releasing Parra to work with that single restriction. The form indicated that it was sent on June 12, 2008. Parra recalled receiving the report from Dr. Mohabeer in the mail, and testified she would have provided the form to Santaguida shortly after she received it. Parra also testified she mentioned the report during a telephone conversation with Georgina Martinez, Santaguida's supervisor.

Santaguida testified that she did not recall receiving Dr. Mohabeer's report, and did not recall Parra ever telling her that Dr. Mohabeer had released her to "light duty." Santaguida acknowledged that if she had known that Parra was released to light duty, she would have "looked into" accommodating her return to work on light duty.

Santaguida prepared a dismissal memo, dated June 18, 2008, addressed to the agency's Regional Director, Diana Barrajas, who was responsible for any ultimate termination decision. The memo requested Parra's dismissal under Chapter 5 of TDFPS's policy manual, entitled "Inability to Work after FMLA," which states: "If an employee is unable to return to work due to the employee's own serious health condition after exhausting the FMLA leave entitlement[:]

---

[6] Parra's job description included a lifting requirement as an essential job requirement, but did not specify a specific number of pounds Parra was required to lift. At trial, several witnesses, including Parra, agreed that she was required to carry younger children in their car seats. Parra believed that she had never been required to lift over 50 pounds.

7

- the employee may exhaust any remaining paid leave accrued prior to taking FMLA leave;

- the agency head may grant leave without pay for up to a total of 12 months, including the 12 weeks of FMLA leave; or

- the employee may be dismissed.

The dismissal memo stated that Parra had been "placed on FMLA" beginning on January 28, 2008, due to a "documented illness" but did not mention that Parra had been involved in a work-related injury. The memo stated that Parra had exhausted her FMLA leave and needed to return to work on April 29, 2008, but did not mention that Parra was on workers' compensation leave at that time. The memo indicated that Parra's request for ESL had been denied in April, but did not mention that Parra had a second pending request for ESL/SLP that had not yet been resolved. The only reference in the memo that would have alerted Barrajas that Parra may have filed a workers' compensation claim was Santaguida's statement that she had contacted the workers' compensation office, and had been informed "that Ms. Parra was seen by her doctor on June 10, 2008 and is not able to return to work at this time and will be seen again by her doctor on June 24, 2008." The memo indicated that Parra's inability to return to work was causing a hardship for Santaguida's unit, and that she had a business need to fill Parra's position.

Santaguida forwarded a copy of the dismissal memo to Matt Guedea of the Office of Attorney General, whom Santaguida described as being the agency's attorney, asking him to review the memo before she provided it to Barrajas. In her memo to Guedea, Santaguida stated that Parra was "currently on Workman's Comp." and had been placed on FMLA, which ran out on April 28, 2008, and that Parra had not returned to work as required. The memo provided no additional details regarding Parra's situation. Santaguida testified that although she spoke with

8

Guedea about Parra's situation, she could not recall any details of their conversations. No evidence was presented whether Guedea approved the June 18 dismissal memo. Guedea was not called as a witness at trial.

Santaguida provided a copy of the memo to her direct supervisor, Georgina Martinez, who had the responsibility to recommend to Barrajas that Parra be terminated. Although Santaguida provided Martinez with a copy of the June dismissal memo, Santaguida did not inform Martinez of the previous late filing of Parra's workers' compensation claim and Parra's late election of benefits. In addition, there is no evidence indicating that Santaguida advised Martinez that her previous attempts to obtain ESL/SLP leave for Parra were denied due to Santaguida's failure to provide adequate documentation to the TLL office in support of the request.

After reviewing the proposed June 18 dismissal memo, Martinez spoke with Parra on June 24. She recalled that Parra informed her that her treating physician had not yet released her to work, and that she had a follow-up appointment scheduled on July 8 with her physician. Martinez agreed to talk with Parra after that appointment. Martinez testified that Parra did not inform her that Dr. Mohabeer had released her to light duty. Martinez testified that if she had known that Parra had been released to light duty, she would have explored the possibility of allowing Parra to return to work on light duty status. Martinez recalled that at some point, Parra told her that she was feeling better, but did not recall Parra telling her that her treating physician, Dr. Palafox, intended to release her after a two-week conditioning program.

Parra, on the other hand, testified that she had no doubt that she informed Martinez about the light duty release during their conversations, and further believed she had made it clear to Martinez that she wished to return to work on light duty. Parra also recalled informing Martinez

9

that her treating physician, Dr. Palafox, had agreed to release her to work after she underwent a two-week work conditioning program, but that they were waiting for the insurance to approve that program. According to Parra, Martinez would not agree to allow her to return to work on light duty status, and instead insisted that she be released to full duty. Parra also recalled that during their July 8, 2008 conversation, Martinez advised her to come back to the office on July 15, 2008, and made it clear that Parra would be terminated if she were not released to full duty by that time.

Although Martinez did not recall advising Parra that she intended to terminate her during their July 8 conversation, she acknowledged that she went forward with the termination recommendation after that conversation because Parra had not been medically released to return to work and there was a business need to fill her position. Martinez acknowledged that prior to recommending Parra's dismissal, she had not read any of the work status reports provided by Parra's attorney, and had not received or reviewed any specific complaints from any employees in Santaguida's unit complaining about Parra's absence.

With Martinez's apparent approval, Santaguida thereafter prepared a second dismissal memo dated July 10, 2008, recommending Parra's termination under the TDFPS policy allowing for termination when an employee has exhausted his or her FMLA leave and is unable to return to work.[7] The second dismissal memo was virtually identical to the first dismissal memo, but provided updated information about Martinez's conversation with Parra on July 8, in which Martinez stated that Parra had informed her that she was "still not released from the doctor to return to work and a date was not known when she will be released to full duty."

---

[7] Although Santaguida prepared the dismissal memo to be submitted to Barrajas, Martinez testified that the ultimate decision to recommend dismissal to Barrajas was her responsibility.

10

Martinez testified that before submitting the memo to the agency director, Barrajas, she spoke with attorney Guedea. Martinez conceded that although she provided a copy of the proposed dismissal memo to Guedea, she failed to advise him of the various problems that had occurred in Parra's case. According to Martinez, she never received a written opinion from Guedea regarding the legality of terminating Parra, and she was unclear about what advice, if any, Guedea may have given when she spoke with him by telephone.

Barrajas recalled that when she received the July 10 dismissal memo, she was not given any supporting documentation from either Martinez or Santaguida regarding Parra's medical status or the need to replace her. Barrajas admittedly did not perform any independent investigation regarding the statements made in the memo. Barrajas instead relied solely on the memo and her verbal conversations with Martinez in approving Parra's termination. Barrajas also acknowledged that prior to approving the termination, no one informed her about the delays that had occurred in filing Parra's workers' compensation claim or about her late election of benefits. Barrajas agreed that it would have been important for her to have that information before she approved Parra's termination.

Barrajas acknowledged that she had the discretion pursuant to TDFPS policy to grant Parra up to 12 months of additional FMLA leave rather than terminating Parra, but she declined to do so because she believed the dismissal memo set forth the three valid reasons for instead terminating Parra: Parra had exhausted her accrued leave, Parra was not medically released to return to work, and Parra's absence had created a hardship for Santaguida's unit.

After receiving Barrajas's approval to terminate Parra, Martinez and Santaguida met with Parra on July 15, 2008. During the meeting, Parra testified that she again informed both

11

supervisors that Dr. Mohabeer had released her to light duty, but according to Parra, Martinez informed her that she was required to return at "full capacity." Both Martinez and Santaguida denied that Parra provided this information to them, and claimed that Parra instead continued to advise them that she had not yet been released to work. Martinez did recall Parra stating that she wanted to come back to work during that meeting. Santaguida advised Parra that she was only being terminated due to a business need to replace her, and Martinez stated that she was welcome to reapply for a position at the agency when she was released to work. Both Santaguida and Martinez agreed at trial that Parra had been a good employee, had never presented any problems for the agency, and that she was not terminated for any work-related issues.[8]

Parra testified that during the July 15 meeting, she was told that she was being terminated because she "was on Workers' Comp," and not because she had exhausted her leave. Parra stated that she was given a choice of either resigning or being terminated. Parra, however, refused to resign because she did not believe that she had done anything wrong. Therefore, she was terminated from her position. Parra recalled that she began crying during the meeting, and she was thereafter required to clean out her desk in front of her coworkers, which caused her to feel "humiliated." Parra also testified that she became "worried" and had "anxiety," because she had never been terminated before and was uncertain about what would happen to her and her family, including her four children. After her termination, Parra stated that she was "depressed," but she

---

[8] Although Martinez recalled giving Parra a copy of the dismissal memo during their meeting, Parra claimed that she was not given a copy, and the memo itself was not signed by Parra, even though it contained a signature block for the "Employee's Signature."

nevertheless finished her work conditioning program, and her treating physician, Dr. Palafox released her to work with a 50-pound lifting restriction on August 26, 2008.

On September 22, 2008, Parra's attorney sent a letter to TDFPS, advising the agency of Parra's release to full duty, and requested that Parra be reinstated to her position. Although Parra's position had not yet been filled at that time, and in fact was not filled until October or November, TDFPS did not respond to her attorney's communication, and Parra never formally applied for the position.

After Parra applied for several other state agency jobs, she was eventually rehired by TDFPS in December 2010 as a case worker assistant, at a lower, entry-level pay rate. Parra explained that due to the gap in her employment with the state, she lost various benefits, including merit pay increases she had previously received, and benefit replacement pay, to which long-time state employees with no break in service are entitled. Parra testified that shortly after she was terminated, she cashed out her retirement account, and during her two years of unemployment, she not only lost her salary, but also her employer-contributed health insurance benefits as well.

## PROCEDURAL BACKGROUND

Parra filed suit for wrongful discharge in 2009, claiming that TDFPS had wrongfully terminated her in retaliation for filing a workers' compensation claim, in violation of Chapter 451 of the Texas Labor Code. Prior to trial, TDFPS filed a plea to the jurisdiction, claiming TDFPS, as a state agency was immune from suit. The trial court concluded the Legislature had waived the State's sovereign immunity. On interlocutory appeal, this Court reached the same conclusion and upheld the trial court's decision to deny the plea to the jurisdiction. *See Texas Dept. of Family & Protective Servs. v. Parra,* 347 S.W.3d 362, 364 (Tex.App. – El Paso 2011, pet. denied).

13

At the close of evidence in the subsequent trial, TDFPS requested a directed verdict, again raising the issue of sovereign immunity and contending that Parra had not presented sufficient evidence to support her claim.   The trial court denied the request.

The jury thereafter found that TDFPS had engaged in conduct prohibited by Chapter 451 by discharging Parra because she filed and instituted a workers' compensation proceeding, and because she hired a lawyer to represent her in a workers' compensation claim.   The jury awarded Parra $106,000 for past lost earnings and benefits, $94,000 for future lost earnings and benefits, and $150,000 in past compensatory damages.

TDFPS thereafter filed both a motion for judgment notwithstanding the verdict, and a motion for new trial, again raising the issue of sovereign immunity, challenging the sufficiency of evidence, and claiming that the trial court had given the jury erroneous instructions on damages. Both motions were overruled by operation of law.   TDFPS also objected to the proposed judgment that Parra's attorney prepared on these same grounds, which the trial court rejected. However, the trial court did reduce the total damage award to $250,000 to correspond to the damages caps set by the Texas Tort Claims Act.   This appeal followed.

## DISCUSSION

### Sovereign Immunity

In its first two issues on appeal, TDFPS contends Parra's claim against TDFPS was barred by sovereign immunity.   We disagree.

#### *The Interlocutory Appeal*

To better understand TDFPS's argument on sovereign immunity, a brief procedural history of this case is in order.   When Parra first filed her lawsuit for wrongful retaliation, TDFPS filed a

14

plea to the jurisdiction claiming sovereign immunity. TDFPS asserted that the anti-retaliation statute found in Chapter 451 of the Texas Labor Code did not contain a clear waiver of the state's immunity from suit. The trial court denied TDFPS's plea to the jurisdiction. TDFPS then filed an interlocutory appeal, and we affirmed the trial court's decision. *See Parra,* 347 S.W.3d at 364.

In our opinion, we noted the Texas Supreme Court had already resolved this issue in *Kerrville State Hosp. v. Fernandez*, 28 S.W.3d 1, 9 (Tex. 2000). In *Fernandez*, the Supreme Court recognized that the anti-retaliation statute found in Chapter 451 was enacted to protect workers from retaliation by their employers for filing a workers' compensation case. In turn, the State Applications Act (SAA), found in Chapter 501 of the Texas Labor Code, determines the situations in which the workers' compensation laws apply to state agencies and expressly provides that state agencies are required to provide workers' compensation benefits to their employees. TEX. LABOR CODE ANN. § 501.002(a) (West 2015). The SAA also expressly provides that for purposes of Chapter 451, the "individual state agency shall be considered the employer." *Id.* at § 501.002(b). The Supreme Court concluded this provision would have no meaning unless the Legislature had adopted it with the express intent of allowing employees to sue a state agency under Chapter 451 as an employer providing workers' compensation benefits. *Fernandez*, 28 S.W.3d at 8. The Court held these provisions constituted a clear and unambiguous waiver of sovereign immunity for workers' compensation retaliation claims brought against a state agency. *Id.* at 5-6.

In its interlocutory appeal, TDFPS urged this Court to reach a different conclusion based on the subsequent adoption of Section 311.034 of the Texas Government Code in 2001, the year after *Fernandez* was decided. Section 311.034 provides that "a statute shall not be construed as a

15

waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language." TEX. GOV'T CODE ANN. § 311.034 (West 2013). TDFPS asserted that Section 311.034 created a new, stricter standard for determining whether sovereign immunity has been waived, and that we should therefore reconsider the Supreme Court's holding in *Fernandez* and conclude that the provisions in the SAA were not specific enough to waive sovereign immunity. We disagreed noting that the Legislature had done no more than merely codify the existing common law principle that sovereign immunity is not waived absent a statute using "clear and unambiguous" language to that effect. *Parra*, 347 S.W.3d at 366. We further concluded that the Legislature's adoption of Section 311.034 did not alter the rationale provided in *Fernandez* because *Fernandez* had applied the same "clear and unambiguous" standard for waiver set forth in Section 311.034. *Id.* We found it significant that the Legislature could have expressed its disagreement with *Fernandez* by amending the Labor Code to make clear it did not intend to waive sovereign immunity in retaliation cases, but had not done so in the decade since *Fernandez* was decided.[9] *Id.* at 365. We therefore held there was "no basis upon which this Court can conclude a different result is warranted in the case before us." *Id.* at 365-66.

---

[9] At the time *Fernandez* was decided, the Political Subdivisions Law (PSL) contained virtually identical language, which the Supreme Court had previously interpreted to mean that the Legislature intended to waive sovereign immunity in cases in which a plaintiff was suing a political subdivision, such as a city or county, for similar anti-retaliation claims. *See, e.g., City of LaPorte v. Barfield,* 898 S.W.2d 288 (Tex. 1995); *Kuhl v. City of Garland,* 910 S.W.2d 929 (Tex. 1995). Five years after *Fernandez* was issued, however, the Legislature amended the PSL to take away this waiver of immunity, by adding a provision expressly stating that, "[n]othing in this chapter waives sovereign immunity or creates a new cause of action." TEX. LABOR CODE ANN. § 504.053(e) (West 2015). The Supreme Court held that this was a clear message from the Legislature that it no longer wished to waive sovereign immunity for political subdivisions in anti-retaliation cases involving employees of such subdivisions. *See, e.g., Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 57 (Tex. 2011). However, as this Court recognized in *Parra*, the Legislature did not similarly amend the SAA, and the SAA provisions waiving immunity are still in place, thereby strongly suggesting that the Legislature intended to keep alive the right of state employees to bring anti-retaliation lawsuits. *Parra*, 347 S.W.3d at 365-66.

16

To date, the Supreme Court has not overruled its holding in *Fernandez*. To the contrary, in 2003, the Court cited *Fernandez* favorably in discussing the concept of sovereign immunity, noting there are "rare occasions" when it has found a waiver of sovereign immunity absent the Legislature's use of "magic words," such where a statutory provision would be rendered "meaningless unless immunity were waived." *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 697 (Tex. 2003). The Court noted that this was the case in *Fernandez,* in which it had held that the provisions of the anti-retaliation statute defining a state agency as an employer would have "no meaning absent waiver of sovereign immunity." *Id.*

Therefore, as we recognized in *Texas Dept. of Aging & Disability Servs. v. Beltran,* 350 S.W.3d 410 (Tex.App. – El Paso 2011, pet. denied), the Supreme Court has already spoken on this issue not once, but twice, and "[u]nder the doctrine of *stare decisis,* it is not our function to abrogate or modify established precedent," as that function lies solely with the Texas Supreme Court. *Id.* at 416 (citing *Lubbock County, Tex. v. Trammel's Lubbock Bail Bonds,* 80 S.W.3d 580, 585 (Tex. 2002)).[10] Accordingly, to the extent that TDFPS is requesting that we reconsider *Fernandez* and our decisions in *Parra* and *Beltran*, we decline to do so.

### The Applicability of the Texas Tort Claims Act

While apparently willing to acknowledge the Legislature did in fact waive sovereign immunity in anti-retaliation cases, TDFPS nevertheless asserts that this waiver was extremely narrow in scope, and did not include the claim Parra brought against TDFPS. In particular,

---

[10] Several of our sister courts have recognized *Fernandez* stands as good law despite the Legislature's adoption of Section 311.034. *See Texas Parks & Wildlife Dept. v. Flores,* No. 03-11-00605-CV, 2012 WL 3239114, at *5 (Tex.App. – Austin Aug. 10, 2012, pet. denied) (mem. op., not designated for publication) (citing to numerous cases, in addition to *Parra* and *Beltran*, that have concluded that *Fernandez* stands as good law despite the adoption of Section 311.034).

17

TDFPS cites to Section 501.002(d) of the SAA, which provides that: "Neither this chapter nor Subtitle A authorizes a cause of action or damages against the state, a state agency, or an employee of the state beyond the actions and damages authorized by Chapter 101, Civil Practice and Remedies Code." TEX. LABOR CODE ANN. § 501.002(d)(West 2015). TDFPS points out that Chapter 101 of the Texas Civil Practices and Remedies Code, more commonly known as the Texas Tort Claims Act, allows a plaintiff to sue a governmental entity only if the claim is based on a government employee's wrongful or negligent use of a motor-driven vehicle or motor-driven equipment, or on the condition or use of real or tangible personal property. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (West 2011). It further points out that under the Tort Claims Act, the Legislature permits a plaintiff to recover only for "property damage, personal injury, and death," or "bodily injury" damages. *See id.* at §§ 101.021, 101.023 (West 2011). TDFPS asserts that because any legislative waiver of immunity must be narrowly construed, we should conclude that the Legislature intended to limit both "claims" and "damages" in anti-retaliation cases to the exact claims and damages permitted by the Texas Tort Claims Act. In other words, TDFPS believes that Parra was only entitled to bring a claim based solely on an injury arising from the negligent operation of a motor vehicle or the negligent use of personal property, and for only any "bodily injury" she suffered due to that negligence. Because Parra's claims did not come within the scope of the Texas Tort Claims Act's wavier of immunity, in terms of either liability or damages, TDFPS asserts that Parra's claims were barred by sovereign immunity and fail as a matter of law.

We agree that courts are required to narrowly construe waivers of sovereign immunity, and that we should therefore resolve any ambiguities in favor of immunity. *See, e.g., Wichita Falls*

18

*State Hosp.*, 106 S.W.3d at 697. However, in the instant case, the Texas Supreme Court has previously considered the applicability of the Texas Tort Claims Act to anti-retaliation lawsuits brought against governmental entities, and has already concluded that its application is not as broad as TDFPS advocates.

In the analogous case of *City of LaPorte v. Barfield*, 898 S.W.2d 288, 297 (Tex. 1995), the Supreme Court considered whether the Legislature had waived governmental immunity in the Political Subdivisions Law (PSL), found in Chapter 504 of the Labor Code, to allow employees of political subdivisions of the state, such as cities and counties, to bring anti-retaliation lawsuits against the political subdivisions. In *Barfield*, the Court noted that the PSL contained similar provisions to those found in the SAA, which required political subdivisions to provide workers' compensation benefits and deemed the state to be an employer for purposes of the Workers' Compensation Act. *Id.* The Court, however, noted that in 1989, the Legislature added a provision to the PSL, similar to the provision in the SAA, stating that nothing in the PSL or in the Workers' Compensation Act authorized any "actions or damages against governmental entities except to the extent allowed by the Tort Claims Act." *Id.* at 298. The Court found this provision troubling, noting that a literal reading would effectively preclude an employee from not only bringing a Chapter 451 retaliation claim, but also a claim for workers' compensation benefits, "unless the claim were based on a government employee's wrongful or negligent use of a motor-driven vehicle or motor-driven equipment, or on the condition or use of real or tangible personal property." *Id.* The Court concluded that it was implausible the Legislature would have required political subdivisions to provide workers' compensation benefits to its employees, yet would have "greatly restricted those benefits to the very limited circumstances in which the Tort

19

Claims Act waives immunity without any expression of intent to do so." *Id.* Noting the difficulties that it faced in reconciling the newly-enacted provision with a waiver of immunity, the Supreme Court nevertheless concluded that the provision could not be ignored entirely. *Id.* at 299. The Court then interpreted the provision with respect to Chapter 451 to not permit the recovery of punitive damages and to cap actual damages based on the limitations set out in the Texas Tort Claims Act. *Id.* The Court noted, however, that whether the restriction in the PSL to "actions and damages authorized by the Texas Tort Claims Act" further limits application of the Anti–Retaliation Law "is an issue that has not been raised in the cases before us and need not be addressed." *Id.*

Shortly after *Barfield* was decided, a municipality did raise the question whether there might be additional limits imposed by the Tort Claims Act in anti-retaliation lawsuits. *See Kuhl v. City of Garland*, 910 S.W.2d 929 (Tex. 1995). In particular, the defendant in *Kuhl* raised a similar argument to the one TDFPS is making, arguing that in order to bring a valid anti-retaliation claim against a political subdivision, the plaintiff's claims must exactly mirror the claims allowed by the Texas Tort Claims Act. The Supreme Court, however, expressly rejected this argument, holding that despite the "literal language of the [PSL] statute" applying the limits of the Tort Claims Act to anti-retaliation cases, it did not believe the Legislature intended to incorporate the exact requirements of the Tort Claims Act into an anti-retaliation lawsuit. *Id.* at 931. Instead, as it did in *Barfield*, the Court concluded that such a literal reading of the PSL was implausible because it "would not only bar all retaliatory discharge claims, but would also bar all basic workers' compensation claims that did not fit within the limited waiver of immunity" provided for in the Tort Claims Act. *Id.*

20

Although the Supreme Court did not directly address whether a plaintiff in an anti-retaliation case against a governmental entity could only bring a claim for "bodily injury" under the terms of the Tort Claims Act, the Court nevertheless impliedly rejected this argument when it concluded that a plaintiff was entitled to receive an award of "actual damages" in retaliation cases. *Id.* In fact, the opinions in both *Barfield* and *Kuhl* contain language strongly suggesting that the only limitations on damages are the damages caps set forth in the Tort Claims Act, as well as the provisions prohibiting an award of punitive damages. *Id.*

TDFPS, however, urges us not to apply the holdings in *Barfield* and *Kuhl* to Parra's case, noting that they were decided under the PSL, which pertains to lawsuits against political subdivisions, rather than under the SAA, which applies to lawsuits against state agencies such as the TDFPS. TDFPS appears to believe that we should apply a stricter standard when determining whether the Legislature intended to waive immunity for a state agency than for a political division because the State is entitled to "sovereign immunity," which TDFPS describes as a "common law rule that has evolved over centuries," whereas political subdivisions are entitled only to "governmental immunity," which TDFPS appears to believe is a somewhat inferior form of immunity. We disagree.

First, there is no substantive distinction between sovereign immunity and governmental immunity, other than the fact that sovereign immunity protects the state and state agencies, while governmental immunity provides "similar protection" to political subdivisions. *Travis Cent. Appraisal Dist. v. Norman,* 342 S.W.3d 54, 57-58 (Tex. 2011). As noted by the Supreme Court, the two terms are often used interchangeably, as they are "related common law concepts that differ only in scope." *Id.* at 58. Further, in determining whether the Legislature intended to waive

21

immunity under both the PSL and the SAA, the Supreme Court has utilized the same "clear and unambiguous" standard for waiver of immunity. And, in both instances, the Court has expressly concluded that the provision did waive immunity. *Fernandez*, 28 S.W.3d at 3; *Barfield*, 898 S.W.2d at 291.

More important, in *Fernandez* the Court has already discussed the applicability of the Tort Claims Act to the provisions of the SAA, and in doing so, used the same analysis it used in *Barfield* when discussing the applicability of the Tort Claims Act to the PSL, citing favorably *Barfield* throughout its discussion of how to interpret the similarly-worded provisions in the SAA. *Fernandez*, 28 S.W.3d at 3-10. In particular, the Court recognized in *Fernandez* that the SAA contained a provision almost identical to the provision found in the PSL at the time, providing that "neither the SAA [n]or the Workers' Compensation Act authorizes actions or damages against governmental entities except to the extent allowed by the Tort Claims Act." *Id.* at 9. As it did in *Barfield*, the Court in *Fernandez* noted that a "literal reading" of that provision would not only bar a state employee from bringing an anti-retaliation lawsuit, but would also bar a state employee from ever bringing any workers' compensation claims against a state agency. *Id*. at 9-10. As in *Barfield*, the Court declined to construe the provision in such a literal manner, and instead construed the provision more narrowly to "incorporate the Tort Claims Act's damage caps." The Court then concluded that, in light of this interpretation, "state agencies that violate the Anti–

22

Retaliation Law may be held liable for damages subject to the limits on damages in the Tort Claims Act."[11] *Fernandez,* 28 S.W.3d at 10.

### *The Tort Claims Act's Bodily Injury Requirement*

Despite the Supreme Court's holding that a plaintiff in an anti-retaliation lawsuit against a state agency may recover "actual damages," TDFPS asserts that those damages should be limited only to the "bodily injury" or personal injury damages allowed under the Texas Tort Claims Act. TDFPS points out that Parra never made a claim for bodily injury damages, and that the jury's award was instead based on economic damages not based on bodily injury. TDFPS argues that the Legislature intended to waive sovereign immunity only for bodily injury, and Parra's award of damages may not stand. We disagree for the same reasons discussed above.

Once again, if we were to construe the SAA provision in the literal manner suggested by TDFPS to only allow claims for "bodily injury," it would effectively prohibit a state employee from ever bringing an anti-retaliation claim against a state employer, because it is virtually impossible to conceive of any case in which an employee would have a claim for "bodily injury" as the result of a wrongful discharge. While an employee might be able to present evidence that he had physical symptoms associated with the stress brought on by a wrongful discharge, as TDFPS correctly points out, such physical symptoms do not amount to a valid claim of bodily injury under the Tort Claims Act. *See, e.g., City of Tyler v. Likes,* 962 S.W.2d 489, 497 (Tex.

---

[11] TDFPS also argues that a workers' compensation retaliation claim is an intentional tort and that the Tort Claims Act does not apply to, and thus does not waive its immunity for, claims "arising out of assault, battery, false imprisonment, or any other intentional tort[.]" TEX. CIV. PRAC. & REM. CODE ANN. § 101.057 (West 2011). If we were to accept TDFPS's argument, we would be required to conclude, in direct contravention of *Fernandez,* that a state employee does not have a cognizable claim for anti-retaliation against a state agency. This would be in clear contravention of well-settled Supreme Court law. *See Beltran*, 350 S.W.3d at 416.

23

1997). Therefore, under TDFPS's proposed interpretation, we would be forced to conclude that, although a state employee has the right to sue a state agency for retaliation, it has no remedy against that state agency. Any such conclusion would not only be unreasonable, it would be in contravention of the Supreme Court's holding in *Fernandez*.

The Supreme Court in *Fernandez* expressly held that an employee has the right to recover damages in a suit for retaliation, albeit without specifying the exact type of damages recoverable. *Fernandez*, 28 S.W.3d at 10. Nevertheless, having concluded that a plaintiff in an anti-retaliation lawsuit has a statutory right to recover damages against a state agency under the Labor Code, we believe that the Supreme Court also contemplated that this statutory right to damages must have some meaning. *See Crosstex Energy Servs., L.P. v. Pro Plus, Inc.,* 430 S.W.3d 384, 390 (Tex. 2014) (we must not interpret a statute "in a manner that renders any part of the statute meaningless or superfluous"). If we were to adopt TDFPS's argument that a plaintiff could recover only bodily injury damages in an anti-retaliation lawsuit, we would in effect be concluding that the statutory right to collect damages was meaningless. This we decline to do.

To the contrary, in looking at the Labor Code as a whole, we are convinced, just as the Supreme Court was convinced, that plaintiffs bringing anti-retaliation lawsuits are entitled to a recovery of actual damages, including economic damages. Section 451.001 expressly provides that a "person may not discharge" an employee for filing a workers' compensation claim in good faith, and that that a "person" who violates Section 451.001 "is liable for reasonable damages incurred by the employee as a result of the violation." TEX. LABOR CODE ANN. §§ 451.001, 451.002(a) (West 2015). In *Fernandez*, the Supreme Court determined that a state agency employer was included within the term "person" as used in Section 451.001, thereby allowing

state employees to sue their state agency employers under the anti-retaliation provisions of the Code. *Fernandez*, 28 S.W.3d at 7-8. Because Section 451.002 uses the identical term "person" in describing the remedies available, we conclude that "person" has the same meaning in both Code sections, and that a state agency is therefore a "person" liable for "reasonable damages" in anti-retaliation lawsuits.

It is well-settled that "reasonable damages" in anti-retaliation lawsuits include both past and future lost earnings and benefits, as well as any mental anguish suffered by the employee as the result of the termination. *See, e.g., Hertz Equip. Rental Corp. v. Barousse,* 365 S.W.3d 46, 58 (Tex.App. – Houston [1st Dist.] 2011, pet. denied) (upholding award in anti-retaliation case for actual damages including lost earnings and benefits, as well mental anguish the plaintiff suffered as the result of his wrongful discharge); *C & D Robotics, Inc. v. Mann,* 47 S.W.3d 194, 202 (Tex.App. – Texarkana 2001, no pet.) (upholding award of damages in anti-retaliation lawsuit for lost wages and mental anguish); *Metal Indus., Inc. of California v. Farley,* 33 S.W.3d 83, 88 (Tex.App. – Texarkana 2000, no pet.)(upholding award of lost earnings and benefits, as well as damages for mental anguish); *Am. W. Airlines, Inc. v. Tope,* 935 S.W.2d 908 (Tex.App. – El Paso 1996, writ dism'd as moot) (upholding award of damages in anti-retaliation lawsuit for lost wages and benefits, and past mental anguish damages).

This is the same measure of damages recoverable in anti-retaliation lawsuits brought against governmental entities under the Labor Code. *See Canutillo Indep. Sch. Dist. v. Olivares,* 917 S.W.2d 494, 499 (Tex.App. – El Paso 1996, no writ) (where, after noting that the Legislature had waived sovereign immunity for the school district under the PSL, we affirmed an award of actual damages for past and future lost wages, as well as mental anguish, subject only to the

damages limitations set forth in the Texas Tort Claims Act); *see also Texas Animal Health Comm'n v. Garza*, 27 S.W.3d 54, 63 (Tex.App. – San Antonio 2000, pet. denied) (concluding that employee who sued a state agency in an anti-retaliation lawsuit was entitled to actual damages, including lost earnings and mental anguish, subject to the employee's duty to mitigate his damages). TDFPS has cited no cases, and we are not aware of any, in which a court has ruled that a governmental employee is *not* entitled to an award of actual damages for lost earnings and mental anguish in an anti-retaliation lawsuit. Moreover, we are unaware of any cases holding, as TDFPS would have us do, that a governmental employee may only recover "bodily injury" damages in an anti-retaliation lawsuit. Accordingly, we reject TDFPS's argument that a state employee recovery in an anti-retaliation lawsuit is limited to only bodily injury damages, and instead conclude that the employee may bring a claim for all the actual damages allowed in Chapter 451, subject to the damage caps set forth in the Texas Tort Claims Act. Because the trial court in this case properly reduced the jury's award to the $250,000 cap set forth in the Tort Claims Act, we find no error. We overrule Issues One and Two.[12]

## The Jury Charge on Damages

---

[12] For the same reasons, we reject TDFPS's assertion that the jury's award of mental anguish damages must be vacated because mental anguish standing alone may not be considered a "bodily injury" under the terms of the Tort Claims Act. We also reject TDFPS's argument that Parra's claim for mental anguish was based solely on the mental pain she suffered as the result of her work-related motor vehicle accident, recovery for which would be barred by the workers' compensation exclusive remedy provision. *See* TEX. LABOR CODE ANN. § 408.001(a) (West 2015). Parra presented evidence concerning her humiliation, worry, anxiety, and depression arising from her termination. And, the trial court instructed the jury that the only mental anguish it could award must be connected to Parra's wrongful discharge, and not to her work-related injury. Also, to the extent that TDFPS is asserting that a plaintiff cannot recover mental anguish absent a physical manifestation, this requirement was expressly rejected by the Supreme Court in *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 443 (Tex. 1995). Finally, TDFPS does not challenge the sufficiency of the evidence supporting the award of mental anguish under the *Parkway* standard, and we decline to address the sufficiency of that evidence.

26

In its third issue, TDFPS contends the trial court's jury instruction on damages was erroneous because it "contained undefined and improper elements of recovery."

### *Employee Benefits*

First, TDFPS challenges the charge for allowing the jury to assess damages for lost earnings and "employee benefits."[13]  TDFPS argues that because the term "employee benefits" was left undefined, the jury could have awarded Parra benefits that she had already received or to which she was not entitled, such as workers' compensation benefits.

Although TDFPS made a general objection that the term "employee benefits" was vague, uncertain, and unclear because it was undefined in the charge, TDFPS did not tender a proposed definition of "employee benefits" to the trial court.   The Texas Rules of Civil Procedure expressly provide that the failure to submit a definition to the jury cannot be deemed a ground for reversal unless a substantially correct definition has been requested in writing and tendered by the party complaining of the judgment.   TEX. R. CIV. P. 278.   Even when the party has objected to the absence of a definition, the party waives error in the trial court's refusal to define a term by failing to request and tender a proper definition in writing.   *State v. Harrington*, 407 S.W.2d 467, 479 (Tex. 1966); *Shelby Distributions, Inc. v. Reta*, 441 S.W.3d 715, 720 (Tex.App. – El Paso 2014, no pet.) (party waived error in charge by failing to request and tender a substantially correct instruction to the trial court); *Lee v. Safemate Life Ins. Co.*, 737 S.W.2d 84, 85 (Tex.App. – El Paso 1987, writ dism'd) (objection to lack of definition in jury charge was too general to preserve issue for appeal; it was incumbent upon party to request definition in substantially correct form to

---

[13] The charge allowed the jury to award Parra both past and future "[l]ost earnings and employee benefits."

27

preserve error). Therefore, we conclude that by failing to tender a proposed definition of "employee benefits," TDFPS waived its right to complain of the lack of a definition on appeal.[14]

### *Compensatory Damages*

Second, TDFPS contends that the trial court failed to provide a proper instruction to the jury defining the terms "compensatory damages" and "nonpecuniary losses" when it instructed the jury to determine whether Parra should be given an award of "[c]ompensatory damages in the past, which may include emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." TDFPS argues that the lack of a definition could have resulted in a double recovery, because the jury may have believed that the term "compensatory damages" covered the economic damages already assessed for Parra's lost earnings and benefits. However, TDFPS has again waived its right to raise this argument by failing to provide a proposed definition of "compensatory damages" at trial, as required by Rule 278. We also note that the trial court cautioned the jury against making a double recovery on the different elements of damages, when it advised the jury to: "Consider each element separately. Do not include damages for one element in any other element."

TDFPS also notes that the term "compensatory damages" includes the concept of both economic and noneconomic damages, and that noneconomic damages is broadly defined by statute to include "physical pain and suffering, mental or emotional pain or anguish, loss of

---

[14] TDFPS also appears to contend that employee benefits are never recoverable in a workers' compensation retaliation case. It is well-settled, however, that an employee may recover not only lost wages but also lost retirement and other benefits that are the result of a wrongful discharge. *See, e.g., Carnation Co. v. Borner*, 610 S.W.2d 450, 454 (Tex. 1980). Further, to the extent TDFPS is once again contending that "employee benefits" are not bodily injury damages recoverable under the Tort Claims Act, we have already concluded that recovery against TDFPS is not jurisdictionally limited to bodily injury damages.

28

consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind other than exemplary damages." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(8, 12) (West 2015 & Supp. 2016). TDFPS argues that Parra did not present any evidence to support recovery for *some* of those losses, such as physical pain, disfigurement, physical impairment, or loss of consortium, and notes its concern that the jury may have awarded damages for those losses without sufficient evidence. We do not share this concern.

First, TDFPS argued at trial that jury confusion would arise because the term "nonpecuniary losses" was left undefined. If TDFPS believed it was necessary to provide a limited definition of "nonpecuniary losses" to avoid any potential confusion, it was incumbent upon TDFPS to tender a limited definition. Because TDFPS failed to tender any such definition, it has waived error. Second, the jury was instructed only that it was to consider a compensatory damages award for "emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses," with no mention of awarding Parra damages for physical pain, disfigurement, physical impairment, or loss of consortium. Although the Civil Practices and Remedies Code provides a broad definition of "noneconomic damages," the jury was never instructed on this broader definition or in any way informed it could award damages for physical pain, disfigurement, physical impairment, or loss of consortium. We therefore believe there was no danger of any jury confusion. Issue Three is overruled.

**Sufficiency of the Evidence**

In its fourth issue, TDFPS argues that the evidence is both legally and factually insufficient to support the jury's finding that it terminated Parra in violation of Chapter 451. We disagree.

### *The Law Governing Anti-Retaliation Claims*

Section 451.001 of the Texas Labor Code provides that a person may not discharge or in any other manner discriminate against an employee because the employee has: (1) filed a workers' compensation claim in good faith; (2) hired a lawyer to represent the employee in a claim; (3) instituted or caused to be instituted in good faith a workers' compensation proceeding; or (4) testified or is about to testify in a workers' compensation proceeding. TEX. LABOR CODE ANN. § 451.001 (West 2015). An employer who violates this statute is subject to a retaliation claim, which is an exception to the traditional "employment at will" doctrine under Texas law. *Kingsaire, Inc. v. Melendez*, 477 S.W.3d 309, 312 (Tex. 2015).

An employee must show that the employer's prohibited action would not have occurred when it did absent the employee's protected conduct. *Id.* (citing *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996)); *Echostar Satellite L.L.C. v. Aguilar,* 394 S.W.3d 276, 286 (Tex.App. – El Paso 2012, pet. denied). An employee generally may rely on circumstantial evidence to prove causation. *Kingsaire, Inc.*, 477 S.W.3d at 312. Such circumstantial evidence may include knowledge of the compensation claim by the decision-maker to terminate, an employer's expression of a negative attitude toward the employee's injury, an employer's discriminatory treatment of the employee compared with similarly situated employees, an employer's failure to adhere to established company policy, and evidence that the employer's stated reason for termination was false. *Id.*; *Cazarez*, 937 S.W.2d at 451. An additional factor is temporal proximity of the termination to the date of the injury or claim. *Echostar Satellite L.L.C.,* 394 S.W.3d at 288. While no one factor is determinative and an employee is not required to produce evidence on all the factors to meet her burden, she must produce "sufficient circumstantial

evidence on a majority of these factors." *Armendariz v. Redcats USA, L.P.,* 390 S.W.3d 463, 469 (Tex.App. – El Paso 2012, no pet.).

### *Standard of Review*

We will sustain a legal sufficiency challenge if no more than a scintilla of evidence is offered to prove a finding. *Kingsaire, Inc.*, 477 S.W.3d at 313; *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014). In conducting a legal sufficiency review, we consider the evidence and reasonable inferences tending to support the finding and disregard contrary evidence and inferences. *Kingsaire, Inc.*, 477 S.W.3d at 313; *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001). A jury, however, may not reasonably infer an ultimate fact from meager circumstantial evidence which could give rise to any number of inferences, none more probable than another. *Kingsaire, Inc.*, 477 S.W.3d at 313; *Hancock v. Variyam*, 400 S.W.3d 59, 70-71 (Tex. 2013).

In a factual sufficiency review, we must consider and weigh all the evidence, and we can set aside a verdict only if the evidence is so weak or is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Unit 82 Joint Venture v. Int'l Commercial Bank of China, Los Angeles Branch*, 460 S.W.3d 616, 624 (Tex.App. – El Paso 2014, pet. denied); *Echostar Satellite L.L.C.,* 394 S.W.3d at 285. In conducting our review, we are mindful that the jury is the sole judge of the credibility of the witnesses and the weight to give their testimony, and that it is within the jury's exclusive province to resolve any conflicts in the evidence. *See Unit 82 Joint Venture*, 460 S.W.3d at 624; *Echostar Satellite L.L.C.,* 394 S.W.3d at 285.

### *Analysis*

31

The jury found that TDFPS terminated Parra in violation of Section 451.001 for filing her workers' compensation claim, for retaining an attorney to assist her with her claim, and for initiating a workers' compensation proceeding. It was therefore Parra's burden to present evidence, whether direct or circumstantial, that but for these incidents, her termination would not have occurred when it did.

*The Absence Control Policy*

It is well-settled in Texas that termination pursuant to the uniform enforcement of a reasonable absence-control policy does not constitute retaliatory discharge. *See, e.g., Kingsaire, Inc.*, 477 S.W.3d at 312; *Cazarez*, 937 S.W.2d at 451. Before we address the sufficiency of the circumstantial evidence, we must address TDFPS's assertion that Parra was terminated pursuant to its absence control policy, because, if termination was required by the uniform enforcement of that policy, circumstantial evidence that could otherwise support a causal link is immaterial. *Kingsaire, Inc.*, 477 S.W.3d at 312; *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005).

It is undisputed that the ultimate decision maker, Barrajas, made the decision to terminate Parra based on the July 10, 2008 dismissal memo, which recommended Parra be terminated under the TDFPS policy allowing for termination when an employee has exhausted her FMLA leave and is unable to return to work. This absence control policy was entitled "Inability to Work after FMLA" and provided:

> If an employee is unable to return to work due to the employee's own serious health condition after exhausting the FMLA leave entitlement,
>
> • the employee may exhaust any remaining paid leave accrued prior to taking FMLA leave;

32

• the agency head may grant leave without pay for up to a total of 12 months, including FMLA leave; or

• the employee may be dismissed.

By its unambiguous terms, the policy did not "require" TDFPS to terminate Parra once her FMLA leave had been exhausted. Rather it gave the agency head the discretion to terminate, or to allow the exhaustion of any remaining paid leave, or to grant additional leave of up to 12 months. Even Barrajas acknowledged that she had the discretion under the TDFPS policy to grant Parra up to 12 months of leave rather than terminating her.

The Supreme Court has made clear that a termination pursuant to the uniform enforcement of an absence control policy makes circumstantial evidence that could otherwise support a causal link immaterial, but only if the termination "was required" by the uniform enforcement of such a policy. *Kingsaire, Inc.*, 477 S.W.3d at 312; *Haggar Clothing Co.*, 164 S.W.3d at 388. For example, in *Kingsaire*, the employer was not liable because it terminated the employee pursuant to an absence control policy requiring that an employee on FMLA leave for a serious medical condition who fails to provide a medical certification of fitness to work at the conclusion of that leave "will be terminated." 477 S.W.3d at 314. In *Haggar*, the employer was not liable because it terminated the employee pursuant to a company policy that the maximum time an employee could remain on leave, regardless of the reason, was one year. 164 S.W.3d at 387; *see also Texas Div.-Tranter, Inc. v. Carrozza,* 876 S.W.2d 312, 313 (Tex. 1994) (employee did not have a valid anti-retaliation case where the undisputed evidence at trial established that he was terminated solely for violating the employer's uniformly-enforced rule that required an employee's termination for missing three consecutive days of work without prior approval).

33

In the present case, however, when TDFPS terminated Parra, it did not rely on a mandatory absence control provision. Instead, it expressly relied on a provision in its policy manual that unambiguously provided the agency with the discretion to exercise three different options when an employee's FMLA leave runs out and the employee is not able to return to work. This included the discretion to allow the employee to exhaust other accrued leave, to grant the employee additional leave up to 12 months, or alternatively to dismiss the employee. This provision cannot be considered a mandatory absence control policy because its unambigously provided TDFPS with the discretion not to terminate an employee who had exhausted her FMLA leave.

In fact, the evidence presented at trial demonstrated that TDFPS did not uniformly terminate employees when their FMLA leave ran out. In particular, TDFPS did not immediately terminate Parra when her FMLA leave ran out, as it was permitted to do under its absence control policy. Instead, Parra was allowed to remain an employee for almost 2-½ months after her FMLA leave and her other leave was exhausted on April 29, 2008. As such, even if the provision could be considered a mandatory absence control policy, it was not uniformly or consistently enforced. *See Echostar Satellite LLC,* 394 S.W.3d at 287 (evidence demonstrated that the employer did not terminate the plaintiff in strict compliance with the absence policy's unambiguous terms, and thus that his termination was not required by the policy's uniform enforcement); *see also Kingsaire, Inc.*, 477 S.W.3d at 316 (citing *Echostar* for the proposition that a plaintiff can raise a fact issue concerning the employer's strict compliance with an unambiguous absence control policy by showing that the policy was not strictly enforced as to the plaintiff). As such, we conclude that Parra was not in fact terminated pursuant to the uniform enforcement of a mandatory absence control policy. We now turn to the evidence supporting the necessary factors.

34

*Knowledge of the Workers' Compensation Claim*

Parra introduced undisputed evidence that her supervisor, Theresa Santaguida, who set in motion and recommended Parra's termination, had knowledge of Parra's workers' compensation claim early on in the process. There was also evidence that Georgina Martinez, Santaguida's supervisor, who reviewed the termination memo and recommended Parra's termination to Barrajas, knew of Parra's workers' compensation claim. And, the ultimate decision maker, Barrajas, relied on Santaguida's July 10, 2008 termination memo in making her decision. That memo implicitly informed Barrajas that Parra had a pending workers' compensation claim because the memo noted that Santaguida had been in contact with the "Workman's Compensation Office" concerning Parra's ability to return to work. Thus, this factor weighs in Parra's favor.

*Temporal Proximity of the Termination*

TDFPS attacks the timing of the termination, noting that Parra was not terminated until July 15, 2008, almost six months after her injury in January 2008 and four months after she filed her workers' compensation claim in March 2008. However, we note that at least two significant events occurred in the interim. First, Parra introduced undisputed evidence that Santaguida knew that Parra had hired an attorney as early as May 1, 2008. Second, while Parra was not officially terminated until July 15, 2008, the evidence showed that Santaguida began engaging in efforts to terminate Parra as early as June 5, 2008, only a month after she found out that Parra had retained an attorney. We therefore conclude the factor of temporal proximity also weighs in Parra's favor.

*Failure to Follow Policy*

There was evidence of numerous instances in which TDFPS violated its policies, state policy, and the Labor Code itself in handling and processing Parra's injury, her lost time, her

35

claim, and the benefits flowing therefrom. Parra's supervisor, Theresa Santaguida, acknowledged that she "messed up" handling of Parra's work-related accident, and even TDFPS's counsel admitted to the jury in argument that there were "screw ups," "errors," and "mistakes" made in handling Parra's workers' compensation claim, but that those mistakes were unintentional. The jury could have reasonably inferred from the sheer number of "mistakes" and the manner in which these "mistakes" were made that TDFPS, and Parra's supervisors in particular, exhibited a negative attitude towards her workers' compensation claim and terminated her for her workers' compensation activity.

1. The Delays in Reporting

First, the undisputed evidence established that TDFPS had a specific policy regarding how work-related injuries were to be handled, which Parra's supervisor violated. TDFPS policy required its employees to notify their supervisor of any work-related accident within 24 hours. In turn, as an important step in ensuring that an injured worker timely receives the benefits to which she is entitled under the Workers' Compensation Act, the injured employee's supervisor is required to report all work-related accidents within 24 hours to the agency's human resources division after receiving information regarding any such accident. The HR division is then required to report the accident to SORM, which serves as the insurance carrier for state employees. Although Parra timely fulfilled her duty under TDFPS policy in reporting the work-related accident to Santaguida the same day as it occurred, the evidence presented at trial was sufficient to establish that Santaguida did not similarly fulfill her duties, as she failed to ensure that Parra's accident was reported to SORM within 24 hours thereafter. Although Santaguida testified that she attempted to submit the reports to the HR division on at least two occasions, the evidence

36

established that they were not received by either TDFPS's HR division or SORM, and TDFPS presented no evidence to explain why the reports were not received. The jury could reasonably infer from this evidence that no report was timely made in contravention of TDFPS policy.

In addition, both state policy and the Texas Labor Code provide that an employer is required to file a notice of the employee's workers' compensation claim with the employer's insurance carrier within eight days of a work-related accident if the employee misses more than one day of work as a result of the accident. *See* TEX. LABOR CODE ANN. § 409.005 (West 2015). This is a critical step in ensuring that an injured worker timely receives workers' compensation benefits. Santaguida testified that she was unaware of this requirement, and admitted that the required notice was not filed on Parra's behalf. Instead, the undisputed evidence established that Parra was forced to file her own claim two months later in March 2008.

TDFPS argues that we should overlook this violation because it did not cause Parra harm since Parra was able to receive her workers' compensation benefits at a later date.[15] TDFPS is correct in pointing out that Parra did in fact receive her workers' compensation benefits at a later date, but this was only because the Labor Code itself protects workers in situations such as this, when the employer has failed in its duties. *See* TEX. LABOR CODE ANN. § 409.008 (West 2015) (when an employer fails to furnish the required injury report to the insurance carrier, the time period for an employee to file a claim for compensation is tolled until such report is furnished); *Hand & Wrist Ctr. of Houston, P.A. v. SGS Control Servs., Inc.*, 409 S.W.3d 743, 750-51 (Tex.

---

[15] TDFPS appears to find it significant that it was never penalized for a violation. That TDFPS was not penalized for a violation is irrelevant. To the contrary, the jury was free to conclude that the state failed to follow state law and its own policies in not penalizing TDFPS for its failures, a factor that weighs in Parra's favor.

37

App. – Houston [1st Dist.] 2013, no pet.) (noting that section 409.005 of the Labor Code, like its predecessor, requires an employer to notify its insurance carrier of employee injuries, but does not provide that the employee forfeits any protections under the Workers' Compensation Act as the result of the employer's late filing). Further, as explained below, the delays in reporting had significant consequences on Parra's ability to make a timely election of benefits and a timely request for extended leave from the agency.

2. The Untimely Election of Benefits

As explained above, state law and TDFPS policy provides that an injured employee must be given the opportunity to make an election of benefits shortly after a work-related injury occurs, allowing the employee to choose between utilizing her own accrued leave, or being placed on workers' compensation leave. Further according to TDFPS policy, an employee who does not make a timely election within five days of the employee's accident is defaulted to the latter choice, and is to thereby automatically be placed on workers' compensation status. However, in deviation from state policy, Parra was not given this form in a timely manner and was not defaulted to workers' compensation status, causing her to exhaust her accrued leave, which was one of the primary reasons for her termination.

Moreover, Parra was asked to make the election after she had already exhausted all of her accrued leave. A late election was not allowed under TDFPS policy. And, in any event, Parra was not provided with any explanation regarding why she was being given the form at such a late date after her leave had already been exhausted, and she was not informed that her leave could be reinstated if she chose the option to be placed on workers' compensation status. TDFPS provided no evidence to the contrary. The jury was therefore free to conclude that, under these unique

38

circumstances, TDFPS's failure to follow its own policy constituted an attempt to ensure that Parra would not have her leave reinstated, thereby ensuring that Parra would be subject to termination for exhausting her leave.

3. The Unsuccessful Requests for Extended Leave

TDFPS Policy also allows the agency to grant an employee extended sick leave (ESL) or sick leave pool (SLP) when her leave has been exhausted if the employee has been employed by the state for at least two years, and was not currently the subject of any disciplinary proceedings.[16] The policy further provides that to "avoid leave without pay, requests for extended sick leave should be submitted . . . at least 10 workdays before the employee's accrued leave is exhausted." In addition, the policy also states that employees who have been injured in a work-related accident may request such leave, but must do so in lieu of receiving workers' compensation benefits.

TDFPS has a set policy governing how these requests are to be handled, which was not followed in Parra's case. The policy expressly provided that once a supervisor receives an employee's request for either extended ESL or ESP leave, the supervisor is required, among other things, to provide the employee with a WH-380 medical form, which, in turn, the employee's physician is to fill out. The supervisor should then submit the completed WH-380 form to the Time, Labor, and Leave office, which is responsible for determining that the request is properly documented, and that the employee meets the eligibility requirements. Once the leave request is submitted, it is supervisor's responsibility to keep the employee informed of the status of the leave request.

---

[16] The policy states that two-year employees may receive up to 320 hours, while three-year employees may receive up to 480 hours.

The record contains evidence from which the jury could have concluded that Santaguida deviated from TDFPS policy in several respects in handling Parra's request for extended leave. First, there is nothing in the record to indicate that Santaguida provided the WH-380 form to Parra before making the request, as required by TDFPS policy. More importantly, the record establishes that two days after she made the request, the TLL office informed Santaguida that it needed the WH-380 form in order to process the request, yet it appears that Santaguida completely ignored TLL's request for the form, causing the request for extended leave to be denied. Further, there is nothing in the record to suggest that Santaguida ever informed Parra of the status of the request, as required by TDFPS policy.

In addition, after Santaguida submitted her second request for extended leave on Parra's behalf on May 6, 2008, it appears that the TLL office concluded that Parra had met the administrative criteria for receiving such leave, but denied the request on June 25, 2008, in part because Santaguida only provided documentation that Parra was receiving medical treatment through June 1, 2008. And once again, the record indicates that Santaguida failed to keep Parra informed of the status of the second request, and that Parra was not informed of the denial until after her termination. These numerous failures of TDFPS to follow state law and its own policies weigh heavily in Parra's favor.

*Stated Reasons for Termination*

We find it significant that Parra's second extended leave request was still pending when Santaguida began making efforts to terminate Parra on June 5, 2008. In fact, Santaguida even drafted a dismissal memo seeking to terminate Parra on June 18, 2008, stating that Parra's accrued leave had been exhausted, mentioning that her first request for extended leave had been denied in

40

April, but failing to mention that her second request was still pending. Santaguida's supervisor, Georgina Martinez, testified that Santaguida was not following "proper procedure" in doing so. The jury could have concluded from this fact alone that Santaguida was being disingenuous in her stated reason for seeking permission to terminate Parra.

Further, as explained above, Santaguida failed to provide relevant information regarding Parra's situation in virtually every memo that she drafted, and as Parra points out, even included false or misleading information, characterizing Parra's absence from work as being the result of a "documented illness" rather than the result of a work-related accident. Santaguida also failed to provide relevant information to both Martinez and Barrajas, who made the ultimate decision to terminate Parra, regarding the delays and other problems that had occurred in handling Parra's workers' compensation claim, and Barrajas herself testified that this was "important" information she should have had before making her final decision to approve Parra's termination. Given the misleading statements made by Santaguida in her dismissal memos and in her conversation with her supervisors, the jury could have concluded that Santaguida was not providing the true reason for terminating Parra in her memos, and was instead purposely being deceitful in seeking permission to terminate Parra.

Moreover, although the final termination memo stated that Parra was being terminated in part because her absence had created a hardship for Santaguida's unit, the jury could have concluded that this reason was false, as Parra presented evidence that she informed Santaguida and Martinez prior to her termination that her doctor intended to release her to full duty status after she completed a two-week work conditioning program, which would have been, and in fact was, completed months before TDFPS was able to hire a replacement for her position. The jury also

41

could have found it significant that TDFPS refused to reinstate Parra after she was released to full duty by her doctor, even though TDFPS had not yet replaced her position, thereby calling into question TDFPS's claim that her absence was causing a true hardship for the unit.

*Discriminatory Treatment in Comparison to Similarly Situated Employees*

Parra presented evidence concerning TDFPA's treatment of two other employees in an attempt to show her treatment was discriminatory in comparison to similarly situated employees.

First, Parra presented the testimony of Maria Sessions, another TDFPS employee who held the same position as Parra, but in a different unit, who suffered a similar work-related injury. In particular, Sessions was in an automobile accident while performing her job duties in December 2008, but unlike Parra, her supervisor assisted her in timely submitting her workers' compensation claim. Also unlike Parra, Sessions was allowed to return to work on light duty, with medical restrictions that prevented her from "Kneeling/Squatting" and "Bending/Stooping." Sessions was allowed to work with these restrictions until she was released to full duty, and was never threatened with termination during that time. However, even assuming Sessions was a "similarly situated employee,"[17] this evidence would not have tended to prove the ultimate issue in the case—whether TDFPS discriminated against Parra *because she filed a workers' compensation claim*—because Sessions was also a workers' compensation claimant. Treating two workers' compensation claimants differently does not tend to show that one was discriminated against because of her workers' compensation activity. *See Parker v. Valerus Compression Servs., LP*,

---

[17] TDFPS points out differences between Sessions and Parra concerning their physical conditions and their ability to perform the essential functions of the job. TDFPS also notes that unlike Parra, Sessions returned to work before her FMLA leave ran out.

365 S.W.3d 61, 69 (Tex.App. – Houston [1st Dist.] 2011, pet. denied) (noting that the employee had not identified a single employee "on extended leave of absence who had *not* filed a workers' compensation claim but had been retained by" the employer) (emphasis added).

Second, at trial, both Georgina Martinez and Diana Barrajas were asked by Parra's counsel about how the agency treated another employee, identified only as "Ms. Olson," who, unlike Parra, was allowed to be placed on extended sick leave after her FMLA ran out. Both Martinez and Barrajas testified that Olson, who had lung cancer, was allowed to retain her job despite being out longer than the 12-week FMLA period. Unlike Parra, Olson had been placed on extended sick leave at the end of the 12-week FMLA period pursuant to the agency's discretionary policy, and was allowed to remain on extended leave for almost 12 months until she retired. Barrajas acknowledged that Olson was treated differently from Parra, but had no explanation why this different treatment occurred. Martinez testified that unlike Parra, Olson had requested to be placed on extended leave before she exhausted her paid leave and thus was not even subject to termination at that time since TDFPS general policy did not allow for termination unless all leave of every type had expired. Of course, in Parra's case, her paid leave might not have been exhausted before she requested extended leave, if she had been given the correct option when she was first injured. However, the evidence showed that Olson was an "investigator" and not a case worker assistant like Parra. And, while Martinez testified that the two jobs were "equally as important," and Barrajas testified that there was a need for both positions to be filled, Parra presented no evidence showing their circumstances were comparable in all material respects. *See Ysleta Indep. Sch. Dist. v. Monarrez,* 177 S.W.3d 915, 917 (Tex. 2005) ("Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards,

43

supervisors, and conduct."). Thus, Parra failed to show that Olson was a similarly situated employee whose treatment could be properly compared to hers. Accordingly, this factor weighs in favor of TDFPS.

### *Expression of a Negative Attitude*

This remaining factor weighs in Parra's favor. Parra testified that during the July 15 termination meeting, she was told by Martinez that she was being terminated because she "was on Workers' Comp," and not because she had exhausted her leave. The jury was free to believe this testimony. Thus, there was at least some evidence of an expression of a negative attitude concerning Parra's injuries.

Based on the record before us, we conclude the evidence was both legally and factually sufficient to support a reasonable inference by the jury that Parra was terminated because she filed and instituted a workers' compensation and because she hired an attorney to represent her in that claim. Issue Four is overruled.

### CONCLUSION

We affirm the trial court's judgment.


                                        STEVEN L. HUGHES, Justice
October 28, 2016

Before McClure, C.J., Rodriguez, and Hughes, JJ.


44