

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| TEXAS DEPARTMENT OF CRIMINAL JUSTICE, | § | No. 08-22-00130-CV |
| | § | Appeal from the |
| Appellant, | | |
| | § | 41ST Judicial District Court |
| v. | | |
| | § | of El Paso County, Texas |
| RITA TIDWELL, | | |
| | § | (TC# 2018dCV3019) |
| Appellee. | | |

## **O P I N I O N**

Appellee Rita Tidwell filed a lawsuit against her former employer, Appellant Texas Department of Criminal Justice (TDCJ), alleging her employment was terminated in retaliation for filing a workers' compensation claim after she was injured on the job. TDCJ filed a plea to the jurisdiction, claiming immunity from suit, which the trial court denied. TDCJ appeals, contending Tidwell failed to allege sufficient jurisdictional facts to waive its immunity.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2012, Tidwell started working at the Sanchez State Jail, a minimum security facility, as a jail commissary assistant manager. In 2016, she became an inventory specialist; her responsibilities included ordering supplies; stocking and retrieving supplies from the jail's supply office and uniform room; and balancing her department's budget on a monthly basis.

### A.  Tidwell's accident

On March 1, 2017, Tidwell was unpacking a large shipment of uniforms and stocking them on shelves in the jail's uniform room. Tidwell used a four-foot stepladder to place a set of uniforms on a shelf that was approximately six- to seven-feet high. At a height of 4'11" and with narrow space, Tidwell routinely placed the ladder sideways in relation to the shelving for better access to the high shelves. That day, as she was descending the ladder, it began to move, causing her to lose her footing and fall backwards into the shelving. It is undisputed that Tidwell sustained injuries to the right side of her body, including her ankle, hand, elbow, and knee in the fall.

The jail's medical personnel and the unit's risk manager, Vicente Quidachay, were summoned to the scene and determined that Tidwell should be taken to a nearby hospital. According to Tidwell, Quidachay helped her fill out a workers' compensation form, which required her to choose how she would use her accrued sick and vacation leave if she lost time from work and when she would begin receiving any workers' compensation benefits to which she might be entitled. [1] As discussed in more detail below, she approved the option that required her to use all of her accrued sick and vacation leave before she would be entitled to receive workers' compensation benefits.

Quidachay drove Tidwell to the hospital, where he assisted her with filling out additional forms, as she was unable to do so given the injuries to her right hand. Quidachay stayed with Tidwell at the hospital until her husband arrived.

---

[1] Quidachay reported that he assisted Tidwell with filling out the form at the hospital, while waiting for her husband to arrive.

### B. Tidwell's placement on modified/light duty

At her doctor's direction, Tidwell stayed home from work through March 6, 2017, but was cleared by her primary care physician to return to work on modified/light duty on March 7. Upon her return, she signed a form entitled, "Offer of Temporary Alternate or Modified Duty Assignment," in which she agreed to return to work in the same position with the same pay but with several medical restrictions, including no use of her right hand and a limit of two hours of standing and walking each day, as well as the requirement that she wear a sling and a walking boot as recommended by her doctor. [2]

Tidwell's duties were purportedly limited to typing and answering the phone; the modified duty restrictions indicated "you shall only be assigned tasks consistent with your physical abilities." TDCJ assigned an officer-in-training to assist Tidwell with the job duties she could not perform, such as retrieving items from the storage room.

Tidwell accepted the modified job offer. As it was underway, the assigned officer-in-training was called away to do other work on various occasions; when she asked the captain for help, she was told that they were too "short" in staffing to provide it to her. Tidwell felt pressured to get her work done, so she ended up working beyond her restrictions. And although TDCJ had previously allowed designated inmates to assist her with some of her tasks, according to Tidwell, for safety reasons she was not supposed to be alone with inmates after her injury. At the same time, Tidwell was exposed to inmates as she went to and from her work area, where she either had to use the stairs in violation of her restrictions or use a slippery ramp, which posed a safety hazard.

---

[2] Light-duty assignments were handled "on a case-by-case basis" as warranted by the business necessity of TDCJ" within the same unit or department.

3

Tidwell requested a different light-duty position that would better fit her restrictions (in open positions in the mailroom and the inmate office) and would remove her from the presence of inmates but was told her pay was too high to place her in one of those positions. Warden Parker indicated that HR assigns light-duty positions based on the needs of TDCJ. And HR Representative Rivas explained that when Tidwell was offered the position with modifications, it was her choice to accept it or not. Tidwell felt compelled to accept the offer understanding that if she did not accept it, her workers' compensation payments would be reduced.

## C. Tidwell's exhaustion of her leave options

In accordance with TDCJ policy, which set forth a twelve-week limitation for an employee to be on modified/light duty, Tidwell's modified job assignment lasted until May 30, 2017.[3] During that time, Tidwell continued receiving treatment for her injuries and provided TDCJ with status reports from her treating physician, who continued to impose restrictions on Tidwell thereby limiting her ability to fully perform her job.[4] When her twelve-week modified job assignment ended on May 30, 2017, her treating physician had still not released her to return to work without restrictions. Tidwell asked if she could move to a secretarial position but was told that the pay differential was too great and she would not get that job, so she did not apply for it.[5] Tidwell did

---

[3] TDCJ policy pertaining to its "workers' compensation and return to work program" provides that an injured employee may only be placed in a "temporary alternate or modified duty assignment" for a "maximum period of 12 consecutive workweeks per work-related injury or illness," and that the time-period cannot be extended, even if the employee "[e]xperiences additional absences due to [the] injury or illness." The policy further provides that if "the employee has not been certified by [her] health care provider to return to full duty," the employee must be placed in the "appropriate leave status in accordance with TDCJ leave policies," or if applicable, be separated from her employment.

[4] On April 10, 2017, Tidwell's orthopedic doctor recommended increasing restrictions on her, to which TDCJ agreed, noting it on Tidwell's Modified Duty Assignment Description.

[5] An HR representative explained that TDCJ had a policy that employees could apply to another job but would not be given any more or less consideration than other applicants.

4

not work and was paid her full salary until she exhausted all of her accrued sick leave and vacation time on July 3, 2017. Tidwell began receiving her workers' compensation benefits the same month.

In a notice dated July 3, 2017, TDCJ notified Tidwell it was placing her on leave without pay (LWOP) for a maximum period of 180 days. The notice required Tidwell to provide TDCJ with status reports from her doctor during her absence and present a "release to return to work" form if and when her doctor released her to work. It also informed her that if she had a permanent disability, her return to work would be governed by the Americans with Disability Act (ADA).

While on LWOP in October 2017, Tidwell had surgery on her right hand, which improved her condition but did not restore her hand to full function. Tidwell provided TDCJ a status report dated November 14, 2017, from her orthopedic physician stating she was "unable to perform [her] job duties" through December 27, 2017. Tidwell subsequently provided TDCJ a final status report dated December 27, 2017, from the same physician releasing Tidwell to work light duty only with continued restrictions on her activities, including limitations on lifting, "pushing/pulling" and "grasping/squeezing" through January 31, 2018.

### D. Tidwell's administrative separation from TDCJ

In a notice dated January 2, 2018, TDCJ notified Tidwell that her LWOP had expired and she was being administratively separated from her employment effective January 3, 2018, due to exhausting her leave entitlements. [6] The notice further stated "[i]f you are able to return to TDCJ employment at a later date, application should be made through the Employment Section, Human Resources Division." Tidwell confirmed that she could reapply once her restrictions were removed. She did not apply for any other positions at TDCJ after being separated from her

---

[6] As explained by a TDCJ employee, being administratively separated is not the same as being fired for cause and does not have a negative connotation. Instead, it means the employee did not "meet a criteria," such as being able to return to work in full capacity after exhausting leave options.

employment and did not make a claim that she was permanently disabled or request an accommodation under the ADA.

### E. Tidwell's lawsuit

In March 2019, Tidwell filed her lawsuit against TDCJ, alleging it wrongfully discharged her in violation of Chapter 451 of the Texas Labor Code for filing her workers' compensation claim. She also alleged that TDCJ created a hostile working environment after she filed her claim, contending, among other things, that TDCJ had failed to provide her with a job she could perform with her restrictions and "worked [her] against her restrictions" during her 12-week modified job assignment. TDCJ filed an answer and special exceptions, seeking to determine if Tidwell intended to raise a separate claim of hostile working environment or if this allegation was part of her Chapter 451 claim of retaliation. It appears that Tidwell did not respond, and the trial court did not rule on the request. [7]

### F. TDCJ's plea to the jurisdiction

Following several months of discovery, TDCJ filed a plea to the jurisdiction and a traditional motion for summary judgment, contending it had governmental immunity from Tidwell's retaliation suit and Tidwell had no evidence to support a prima facie case of retaliation that would have waived its immunity. In particular, TDCJ alleged she had no evidence of a causal connection between the filing of her workers' compensation claim and her termination. TDCJ argued that the undisputed evidence showed it terminated Tidwell solely due to exhausting her

---

[7] Tidwell did not argue in her appellate brief that she suffered from a hostile work environment after she filed her workers' compensation claim. *See ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 880–81 (Tex. 2010) (to preserve error on appeal, the Texas Rules of Appellate Procedure require adequate briefing, which includes making a clear and concise argument for the contentions made with appropriate citations to authorities and to the record) (citing TEX. R. APP. P. 38.1(i)). Accordingly, we do not address it in this opinion.

leave options, as required by TDCJ's uniformly enforced leave policy. Tidwell responded to the plea, arguing, among other things, that TDCJ failed to uniformly enforce its absence control policy and she had circumstantial evidence to support an inference that TDCJ's real reason for terminating her was retaliation for filing a workers' compensation claim.

Following a hearing, the trial court denied TDCJ's plea to the jurisdiction and motion for summary judgment in its entirety. This interlocutory appeal ensued.

## II. ISSUES ON APPEAL

In a single issue, TDCJ contends that the trial court erred by denying its plea to the jurisdiction, arguing Tidwell failed to come forward with sufficient jurisdictional evidence to raise a question of fact on her retaliation claim and therefore did not establish that the agency waived its immunity.

## III. STANDARD OF REVIEW AND APPLICABLE LAW

### A. Pleas to the jurisdiction and the State's immunity

In Texas, governmental units, like TDCJ, enjoy sovereign immunity from lawsuits except where the Legislature waives immunity. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *see also Flores v. Tex. Dep't of Criminal Justice*, 634 S.W.3d 440, 450 (Tex. App.—El Paso 2021, no pet.) (citing *Tex. Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 388 (Tex. 2011)). Sovereign immunity deprives a trial court of subject-matter jurisdiction. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012). The Legislature has provided a limited waiver of immunity for claims brought against governmental units alleging violations of Chapter 451 of the Texas Labor Code, which prohibits an employer from retaliating against an employee for filing a workers' compensation claim. *See Tex. Dep't of Motor Vehicles v. Bustillos*, 630 S.W.3d 316, 328 (Tex. App.—El Paso 2021, no pet.) (citing

7

*Kerrville State Hosp. v. Fernandez*, 28 S.W.3d 1, 2 (Tex. 2000) (recognizing that a Chapter 451 cause of action applies against a state agency employer as it does against a private employer); *see also* TEX. LAB. CODE ANN. § 451.001(1) ("A person may not discharge or in any other manner discriminate against an employee because that employee has . . . filed a workers' compensation claim in good faith."). However, the waiver extends only to suits in which the pleadings state a prima facie claim for an actual violation. *See Bustillos*, 630 S.W.3d at 330; *see also Tex. Dep't of Criminal Justice v. Flores*, 555 S.W.3d 656, 661 (Tex. App.—El Paso 2018, no pet.) (citing *Mission Consol.*, 372 S.W.3d at 636) (discussing waivers of immunity under the Texas Human Rights Act). If the plaintiff fails to state a prima facie case of a Chapter 451 violation, the governmental unit retains its immunity from suit. *Bustillos*, 630 S.W.3d at 330 (citing *Mission Consol.*, 372 S.W.3d at 636).

Here, the TDCJ may properly assert immunity from suit through a plea to the jurisdiction or motion for summary judgment. *Id.* at 325-26 (citing *Texas Dep't of Transportation v. Jones*, 8 S.W.3d 636, 637 (Tex. 1999) (per curiam); *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999)). "We review a trial court's ruling on a plea to the jurisdiction de novo." *Id*. at 326 (citing *Miranda*, 133 S.W.3d at 228). In a plea to the jurisdiction, a party may challenge either the pleadings or the existence of jurisdictional facts, or both. *Id.* at 326–27. When, as here, a plea challenges the existence of jurisdictional facts, we consider the relevant evidence submitted by the parties to determine if a fact issue exists on the question of whether the plaintiff has set forth a prima facie case in support of her claim. *Id.* (citing *Miranda*, 133 S.W.3d at 227); *see also Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021) (when a defendant challenges the existence of jurisdictional facts with supporting evidence, the court must move beyond the

pleadings and consider the proffered evidence) (citing *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018)).

In such cases, "this standard generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Bustillos*, 630 S.W.3d at 326 (quoting *Miranda*, 133 S.W. 3d at 228). Under this standard, if the governmental unit asserts and supports with evidence its contention that the trial court lacks subject-matter jurisdiction, we simply require the plaintiffs, when the facts underlying the merits and subject-matter jurisdiction are intertwined, to show that there is a disputed material fact regarding the jurisdictional issue. *Id.* In determining whether a material fact issue exists, we examine the evidence presented by both parties, and we take as true all evidence favorable to the plaintiff, to include indulging every reasonable inference and resolving any doubts in favor of the plaintiff. *Id.* In doing so, however, we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not. *Alamo Heights*, 544 S.W.3d at 771 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 811–12, 822–23, 827 (Tex. 2005)).

### B. Labor code Chapter 451 and Tidwell's prima facie case

To overcome a plea to the jurisdiction or motion for summary judgment, Tidwell has the burden of making prima facie showing that she filed a workers' compensation claim in good faith and there is a causal link between her filing the claim and TDCJ discharging her. *See Bustillos*, 630 S.W.3d at 330 (citing Tex. Lab. Code Ann. § 451.001(1) ("A person may not discharge or in any other manner discriminate against an employee because the employee has . . . filed a workers' compensation claim in good faith."); *Cardenas v. Bilfinger TEPSCO, Inc.*, 527 S.W.3d 391, 399 (Tex. App.—Houston [1st Dist.] 2017, no pet.)). To establish a causal connection between her firing and filing her workers' compensation claim, Tidwell is not required to show that filing the

9

claim was the sole cause of TDCJ terminating her; instead, she must demonstrate that but for filing the claim, the termination "would not have occurred when it did." *Id.* (citing *Kingsaire, Inc. v. Melendez*, 477 S.W.3d 309, 319 (Tex. 2015); *Cont'l Coffee Products Co. v. Cazarez*, 937 S.W.2d 444, 451 (Tex. 1996); *Hernandez v. Am. Tel. & Tel. Co.*, 198 S.W.3d 288, 291 (Tex. App.— El Paso 2006, no pet.)).

"This causal connection may be established by either direct or circumstantial evidence." *Bustillos*, 630 S.W.3d at 330 (citing *Kingsaire,* 477 S.W.3d at 312*; Hernandez,* 198 S.W.3d at 291); *see also Echostar Satellite L.L.C. v. Aguilar*, 394 S.W.3d 276, 287 (Tex. App.—El Paso 2012, pet. denied). The Supreme Court has identified several factors that a court may consider as circumstantial evidence of a causal link. *See Bustillos*, at 330 (citing *Cont'l Coffee*, 937 S.W.2d at 451). These factors are: "(1) knowledge of the compensation claim by those making the decision on termination; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false." (collectively, the *Continental Coffee* factors). *Id.* (citing *Cont'l Coffee*, 937 S.W.2d at 451). [8]

However, terminating an employee as required by a uniformly enforced, reasonable absence-control policy does not constitute retaliatory discharge; in that situation, circumstantial evidence that could otherwise support a causal link is immaterial. *See Tex. Dep't of Family & Protective Services v. Parra*, 503 S.W.3d 646, 666 (Tex. App.—El Paso 2016, pet. denied) (citing *Kingsaire*, 477 S.W.3d at 312; *Cont'l Coffee,* 937 S.W.2d at 451). In *Kingsaire*, the court held an employer not liable for retaliation where Kingsaire uniformly enforced its policy by terminating

---

[8] In addition, courts may consider temporal proximity between the date of injury and the termination in evaluating evidence of a causal link, but that was not argued in the present case. *Tex. Dep't of Motor Vehicles v. Bustillos*, 630 S.W.3d 316, 330 (Tex. App.—El Paso 2021, no pet.) (citing *Echostar Satellite L.L.C.*, 394 S.W.3d at 288).

10

employees who did not return to work immediately after their FMLA leave expired. *Kingsaire*, 477 S.W.3d at 316. Similarly, in *Haggar*, the court held that an employer was not liable where it terminated an employee pursuant to a one-year absence-control policy where there was evidence that the employer "failed to officially discharge one employee who had been on leave for over a year" but did not pay her. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 389 (Tex. 2005). The court reasoned that treating the one employee in this manner did "not amount to more than a scintilla of evidence that the policy was not uniformly enforced or that Haggar's explanation for firing [the employee] was false" in the absence of circumstantial evidence of discriminatory application of the absence-control policy or evidence that Haggar's explanation for the termination was false. *Id* at 389; *see also Texas Div.-Tranter, Inc. v. Carrozza,* 876 S.W.2d 312, 313-14 (Tex. 1994) (per curiam) (employee did not have a valid anti-retaliation case where he offered no evidence to controvert employer's explanation that he was terminated solely for violating a uniformly enforced collective bargaining agreement three-day absence rule).

On the other hand, as we recognized in *Parra*, if the employer's absence-control policy gives it the discretion not to terminate an employee who has violated the policy, it cannot be considered the type of mandatory absence-control policy that will protect an employer from a retaliation claim. *See Parra*, 503 S.W.3d at 667 (provision in employer's policies cannot be considered a mandatory absence-control policy because it unambiguously provided the employer with the discretion not to terminate an employee who had exhausted her FMLA leave).

## IV. TDCJ'S MANDATORY ABSENCE-CONTROL POLICY

Here, TDCJ contends Tidwell's termination was required by TDCJ's mandatory, uniformly enforced absence-control policy after she exhausted all of her leave options. Tidwell contends the agency's leave policies are not, and cannot be, uniformly enforced in part due to the fact that TDCJ

11

offers employees different options regarding how they may use their leave when they are injured on the job, which results in an unequal application of its leave policies depending on the employee's election and situation.

The first election, which Tidwell chose, requires an injured employee to use all of her accrued sick leave and vacation leave before receiving workers' compensation payments, in which case the employee is paid at her normal pay rate by the agency until she runs out her leave time. Under this election, once the employee's leave entitlements are exhausted, the employee is then placed on LWOP-Medical status for a maximum period of 180 days [9] (and if eligible, may receive workers' compensation benefits). As TDCJ manager Amanda Flinn explained, and as reflected in TDCJ's written policies, the leave period cannot be extended for any reason (unless the employee is eligible for FMLA or LWOP military by law).[10] Under this policy, if the employee is not released to full-duty status at the expiration of her 180-day LWOP period, the agency must administratively separate her.[11]

Tidwell points out that under that second and third options, the employee may freeze either all or a portion of her accrued vacation time; therefore, unlike with the first option, the employee selecting the second or third option is not required to exhaust her vacation time before being placed on LWOP status. [12] TDCJ's leave policy expressly distinguishes between the options, providing "[a]ll of an employee's accrued leave balances and administrative leave shall be exhausted before

---

[9] TDCJ medical and parental leave policy expressly states that the "maximum period an employee can request [to be on] LWOP-Medical [is] 180 calendar days."

[10] Tidwell did not claim to be eligible for FMLA leave or LWOP military.

[11] TDCJ leave policy states that: "[a]n employee *shall* be separated upon exhaustion of LWOP-Medical (emphasis added)."

[12] But the employee is required to first exhaust her sick leave.

12

an employee is eligible to use LWOP-Medical, unless the employee is on workers' compensation and has frozen part or all of the employee's accrued leave." Moreover, unlike the employee opting for the first election who must exhaust all of her leave before receiving workers' compensation payments, the employee opting for the second or third option may start receiving workers' compensation payments after a seven-day waiting period. In addition, unlike the employee opting for the first election, this employee is not eligible to apply for extended sick leave or the sick leave pool to receive any donated sick leave. When this employee has exhausted her sick leave and is unable to return to work, she may then be placed on LWOP for 180 days; however, if she is not fully released to return to work after the LWOP period expires, she will then be placed on the active payroll for purposes of exhausting her previously frozen vacation time. If she is still not released to full-duty after her vacation is expired, the agency must administratively separate her from her employment.

Accordingly, Tidwell is correct that there are differences in how the two sets of employees are treated—at least in terms of the type of sick leave for which they may be eligible. Regardless of which election the employee makes (and which order she exhausts her leave entitlements), under its absence control policies, TDCJ must terminate an employee who has exhausted all of her leave entitlements and is unable to return to work on full-duty status. There is no evidence of any instance in which TDCJ has deviated from this policy or any employees who were not terminated after their leave entitlements expired.[13]

---

[13] In her briefing, Tidwell refers to another employee she believes was treated more favorably than her in terms of the type of modified job assignment she was given—an issue we discuss in more detail below. However, Tidwell does not allege that TDCJ did not follow its absence-control policy with respect to this employee.

## V. CAUSAL LINK ANALYSIS: *CONTINENTAL COFFEE* FACTORS

Even if we were to assume TDCJ did not uniformly enforce its leave policy due to the differences in sick leave access, Tidwell has not come forward with sufficient circumstantial evidence to support an inference that there is a causal connection between the filing of her workers compensation claim and her termination, as required by *Continental Coffee*. While there is not a single dispositive *Continental Coffee* factor, to meet her burden, Tidwell "must produce 'sufficient circumstantial evidence on a majority of these factors.'" *See Parra*, 503 S.W.3d at 665 (citing *Armendariz v. Redcats USA, L.P.*, 390 S.W.3d 463, 469 (Tex. App.—El Paso 2012, no pet.) Regarding the first factor, TDCJ tacitly admits that it knew about Tidwell's workers' compensation claim filing at the time of her termination. We turn to examine the remaining factors next.

### A. Evidence that TDCJ had a negative attitude toward Tidwell's injuries

Tidwell contends that TDCJ exhibited a negative attitude toward her injuries in six ways.

### 1. Tidwell's initial injury report and her workers' compensation election

First, Tidwell argues TDCJ minimized her injuries in its initial injury report by only referring to her sprained ankle and not to the other injuries she suffered. Pursuant to TDCJ policy, Tidwell was responsible for filling out that report, and Tidwell approved and signed the report listing only her sprained ankle. In addition, the record reflects that after receiving Tidwell's doctor's reports, TDCJ acknowledged that she had suffered additional injuries and never challenged the corresponding work restrictions her doctors placed on her.

14

Tidwell also complains that Quidachay rushed her into making an election on the workers' compensation form, in essence pushing her into making the first election, and signing the injury report rather than giving her time to determine which of the elections would be best.[14]

## 2. Quidachay's presence in Tidwell's hospital room

Second, Tidwell contends that Quidachay was in her hospital exam room without a HIPAA release in violation of HIPAA and without her consent in an attempt to exhibit power over her. Tidwell did not indicate that she had any objections or concerns about him being present, and it appears that she willingly allowed him to transport her to the hospital and wait with her until her husband arrived. We note, however, that Quidachay testified without contradiction that he was not in Tidwell's exam room while her doctors were treating her. There is nothing in the record to indicate that Quidachay disclosed any of her personal information to a third party. *See generally* 45 C.F.R. § 164.502 (a) (providing that a "covered entity or business associate may not use or disclose protected health information," except as otherwise permitted by law).

## 3. The nature of Tidwell's modified-duty assignment

Third, Tidwell complains about her modified-duty assignment, contending that TDCJ "worked [her] against her restrictions" by requiring her to shelve items in the storage room during her modified/light-duty assignment. Tidwell explained that she was assigned typing and answering phones (according to the light-duty offer) and was provided an officer-in-training to assist her with tasks she was restricted from performing. Tidwell indicated that she violated the work restrictions when her assistant was called away to other duties or otherwise absent because she felt pressured

---

[14] We note that an employee is entitled to request a change to her election at a later date; there is nothing to indicate that Tidwell made any attempt to change her election at any point.

15

to get the work done.[15] Tidwell stated that her requests to her immediate supervisor for help when the officer-in-training was not present were not met due to short-staffing. She did not complain to anyone above her immediate supervisor about this or wait for the assistant to complete tasks.

Assistant Warden Amonett indicated that he had no knowledge of any problems with the way she was performing those duties or whether she was being worked against her restrictions. He further articulated that "[s]he was not allowed to do anything outside her restrictions that the doctor gave her" regardless of where she was assigned. Warden Parker echoed the same sentiment: "We place them in an area [] where they have the opportunity to work inside of their restrictions. But . . . it's the employee's responsibility to ensure they are not working outside of those restrictions. And if the departmental supervisor in which they are working for requests them to do that, then they should tell the supervisor, [t]hat's not within my work restrictions." And he explained the employee should go all the way up the chain of command to complain if their supervisors disregarded the issue. HR Representative Rivas also reiterated that it's "their responsibility not to work against their restrictions" and that she would "make sure the employee understood what their restrictions were."

### 4. Requiring Tidwell to use the stairs to reach her office

Fourth, Tidwell complains that TDCJ required her to use a certain entrance to the jail, which required her to be exposed to inmates and use the stairs, thereby violating her doctor's restrictions. Tidwell explains that she was called into Assistant Warden Amonett's office because

---

[15] While she was on light-duty, the site was preparing for a credentialing inspection, and Tidwell was time-pressured to complete her portions of the requirements. She also stated "I ended up doing what I needed to do to get my job done because if things got delayed, then I was called in to Warden Amonett's office or Warden Parker's office to talk to me about how paperwork wasn't getting done . . . in a timely fashion." Tidwell reported that she was held to the same standards as before regarding her reporting—as to one monthly report that was late by a day and a half, Warden Parker told her she "needed to make sure things got done appropriately so supply could run the way it should be." Tidwell told him she would "do [her] best." Tidwell was never disciplined while on light-duty.

she was using the stairs instead of the ramp. Tidwell told both him and Warden Parker that she was "not going to go up that ramp. . . . That is where they dump the used oil. . . . And I had a plastic base on the bottom of my boot; and going up that ramp, it's slippery." Tidwell told them there were only four stairs so she would go up the stairs slowly one at a time instead of using the ramp; after she told him "[n]o" to the ramp, Amonett reportedly told her "Well, then, just be careful." Tidwell further explained in her deposition "It would have been easier if I could have went [sic] through the commissary, . . . and then I wouldn't have had to go [up] any step or ramp. But the policy is that if you don't work in the commissary, you're not going in the commissary unless you're a correctional officer. So I could not go through the commissary."

### 5. The instructional letter

Fifth, Tidwell contends that despite Captain Perez and Assistant Warden Amonett being aware of her routine use of the ladder in this way due to her height and inability to reach the highest shelves, due to the tight space in the uniform room, and despite having requested and been denied a different ladder in 2016 when she asked, TDCJ issued a letter of instruction faulting her for her injuries. It indicated she had used the ladder incorrectly and that this incorrect usage of the ladder was the cause of her injuries. [16] Assistant Warden Amonett stated in his deposition that he had "never seen her use the ladder incorrectly before, or correctly." In response to the question "[d]id you ask any supervisor, any co-workers, if they had seen her use that ladder in that specific manner

---

[16] Following her accident, several TDCJ employees conducted a routine investigation into the cause of her accident then sent Tidwell a "letter of instruction" dated May 5, 2017, informing her that she had not been using "appropriate climbing techniques" at the time of her accident. According to the letter, the accident could have been prevented if Tidwell had used proper safety procedures by facing the step ladder toward the shelving where she had been working. Quidachay, who helped investigate the ladder use acknowledged that the ladder training documents indicate that there might be instances in which it would be safer to use the ladder sideways, such as in a retail stock room and space constraints in narrow areas. He was not aware of whether Tidwell could reach the top shelf with the ladder at issue or whether she had other ladders available to her. The investigation did not include questions about her normal practices with the ladder.

17

in the past?" Assistant Warden Amonett, who assisted in the investigation, stated "No. They receive safety training on appropriate climbing. I didn't interview—there was nobody else that witnessed it." Amonett was on the Incident Review Board and initially recommended formal discipline for the manner in which Tidwell used the ladder, but his superior, Warden Parker, reduced it to a letter of instruction.

The resulting instructional letter states it is "designed to create a positive change in employee behavior." Tidwell indicated that she was not disciplined for the way she used the ladder nor disciplined in connection with the letter.

### 6. Alleged failure to accommodate

Sixth and finally, Tidwell contends TDCJ failed to accommodate her by not offering her a second modified job after her first modified job assignment ended. TDCJ's policies expressly state that it is required to offer an injured employee a twelve-week modified job assignment, and if the employee is not able to return to work on full duty after that time, she must be placed on the appropriate leave status. There is an accommodation policy that provides for TDCJ to offer a modified job assignment where an employee with a permanent disability requests a reasonable accommodation under the ADA, which Tidwell indicates she did not do.

The only other way to move to another position, according to TDCJ HR representative Amanda Flinn, is if the employee formally applies for the position and goes through the selection process, then each of the candidates meeting the minimum qualifications for the position gets an interview; Flinn explained "[t]here's is no deviation from that." Tidwell explains that she wanted to transfer to a secretarial position even before her leave time was exhausted and asked but was told that she would not get the job because the pay was too low, so she never applied.

Although we acknowledge the points Tidwell raises, she has not explained how the evidence above, taking her statements as true, constituted a negative attitude on the part of TDCJ toward her injuries. And as to the instructional letter, the Texas Supreme Court has recognized that an employer is entitled to investigate the cause of an accident and that doing so does not support an inference that an employer harbored a retaliatory intent in subsequently terminating an employee. *Cont'l Coffee*, 937 S.W.2d at 452.

## B. Evidence that TDCJ treated similarly situated employees differently

Tidwell next argues that TDCJ treated similarly situated employees differently, which constitutes circumstantial evidence that she was discriminated against based on filing her workers' compensation claim. In support of her argument, Tidwell claims that an injured officer was given a modified job assignment allowing her to work in the mailroom while TDCJ denied Tidwell's request to be given the same assignment. As TDCJ points out, however, Tidwell was not similarly situated to the officer, as they performed entirely different jobs and had entirely different responsibilities and supervisors. *See Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 312 (Tex. 2020) (recognizing that employees are similarly situated "if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct," and they are not similarly situated if they "hold different jobs."). Moreover, there is no evidence the officer filed a workers' compensation claim or that she was placed on LWOP and was thereafter treated more favorably than Tidwell. *See Bustillos*, 630 S.W.3d at 336 (recognizing that to be similarly situated for purposes of a workers' compensation retaliation case, the other employee must have also filed a workers' compensation claim).

## C. Evidence TDCJ failed to follow its policies

Tidwell also claims that TDCJ failed to follow its own policies after she was injured with respect to both her modified job assignment and her termination. Tidwell claims that TDCJ did not follow its policies when she was on modified light duty, as she was required to access her office through a gate into an inmate area where metal was prohibited. Tidwell explained that the walking boot prescribed by her doctor had metal in it, and working with inmates while having metal on her caused her distress and anxiety.[17]

We are unable to connect the fact that TDCJ may have required Tidwell to enter a restricted area while wearing her boot with metal components in violation of a safety policy to the question of whether she was terminated against TDCJ policies. *See generally Bustillos*, 630 S.W.3d at 335– 36 (the dispositive issue is "not whether an employer ever engaged in any activity against their own policies; rather, we must ask whether an employer terminated an employee against its own policies."). Tidwell has presented no evidence to support her claim that she was terminated against TDCJ policies.

## D. Evidence that stated reason for discharge was false

In the last of the *Continental Coffee* factors, Tidwell seeks to establish that TDCJ's stated reason for terminating her, i.e., that she exhausted her leave options, was pretextual, contending TDCJ provided different and conflicting reasons for her termination. As a preliminary matter, we recognize that an employer providing conflicting reasons for terminating an employee can be

---

[17]Tidwell complained that she was exposed to inmates regardless of whether she used the stairs or ramp, which she contended was not appropriate for light-duty work, especially since she could not use her pepper spray with her injured hand. HR representative Rivas explained that since Tidwell's job was behind the gate and she received hazard pay, exposure to inmates was part of her job regardless of the light-duty position at the time, and she could have chosen not to take the light-duty offer. Rivas stated in her deposition she was not aware of any TDCJ policy whereby injured employees on light-duty should not be exposed to inmates.

considered circumstantial evidence giving rise to an inference of pretext. *See Univ. of Tex. Sw. Med. Ctr. v. Vitetta*, No. 05-19-00105-CV, 2020 WL 5757393, at *21 (Tex. App.—Dallas Sept. 28, 2020, no pet.) (mem. op.) ("Doubt in the employer's asserted reason can be established in a number of ways, including by proof that the employer provided shifting or different reasons for its action at different times.") (citing *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) ("employer's inconsistent explanations for an employment decision 'cast doubt' on the truthfulness of those explanations")). However, here we find no conflict in the reasons that TDCJ provided for Tidwell's termination.

The record reflects that TDCJ maintained it released Tidwell from her employment after she exhausted all of her leave options in both its termination paperwork and in its responses to the Texas Workforce Commission (TWC) when Tidwell applied for unemployment benefits. Tidwell, however, contends that TDCJ stated in the TWC paperwork that she quit instead of being administratively separated. This statement was not made by TDCJ, but instead by TWC, which found Tidwell was entitled to unemployment benefits because she had "quit [her] job because of [her] medically verifiable illness."

Tidwell next contends TDCJ gave a third reason for terminating her in a letter that a TDCJ employee wrote on January 8, 2018, regarding Tidwell's separation in a "comments section": "Employee did not return to work alternate/modified duty on 1/2/2018, as previously reported." The letter referenced appears to be a printout of form "SORM90–Notification of Additional Information" relating to Tidwell's case. We are unable to ascertain the context in which the comment was made, and Tidwell acknowledges there is nothing in the record to suggest TDCJ gave her a second job offer or that TDCJ was even permitted to extend such an offer.

21

Finally, Tidwell contends that TDCJ's reason for terminating her was pretextual, as the notice placing her on LWOP asked her to return any property that TDCJ had issued to her (including any uniforms, badges, ID cards and weapons), which reflected TDCJ's intent to terminate her upon placing her on LWOP. The notice, however, clearly stated that the requirement of returning property did not mean Tidwell was being "separated from employment" and only meant that she was "clearing [her] property account until such time that [she was] able to return to work." The Texas Supreme Court has indicated that requiring an employee to return property while on extended leave status in accordance with the employer's policies does not raise an inference that the employee was terminated at that time. *See Kingsaire, Inc.*, 477 S.W.3d at 316–17 (rejecting employee's argument that requiring him to return his uniforms and other property belonging to employer while on FMLA was the equivalent of a termination). We do not view the requirement that Tidwell return TDCJ property while on extended leave as raising an inference that TDCJ's reasons for terminating her were pretextual. *Id*. at 317 (finding employer's requirement that employee return his uniforms while on FMLA constituted "meager circumstantial evidence" that "could give rise to any number of inferences, none more probable than another.") (quoting *Hancock v. Variyam*, 400 S.W.3d 59, 70 (Tex. 2013)).

In sum, we conclude that Tidwell has failed to raise a question of fact on whether TDCJ's stated reason for terminating her based on its absence-control policy was pretextual in nature**.**

## VI. NO EVIDENCE OF OTHER ADVERSE EMPLOYMENT ACTIONS

As a final matter, we note Tidwell's argument that even if we find Tidwell was properly terminated, we should nevertheless consider whether TDCJ discriminated against her prior to her termination. However, one of the essential elements of an employment discrimination claim is that the plaintiff must have suffered an adverse employment action, such as a termination or a failure

to hire, promote or compensate. *See Esparza v. Univ. of Tex. at El Paso*, 471 S.W.3d 903, 908-909 (Tex. App.—El Paso 2015, no pet.); *see also Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 764 (Tex. 2018) (holding that a "remedy only exists for retaliation when the evidence establishes that a materially adverse employment action resulted from the employee's protected activities."). Tidwell has not explained what adverse employment action was taken against her that would support her discrimination claim short of termination. Tidwell received the same pay while on her modified job assignment and did not receive any form of discipline during that time.[18]

## VII. CONCLUSION

Accordingly, for the reasons set forth above, we conclude that Tidwell failed to establish a prima facie case of retaliation for filing her workers' compensation claim and sustain TDCJ's sole issue. The trial court erred by denying TDCJ's plea to the jurisdiction. We reverse the trial court's order and render judgment in TDCJ's favor.

LISA J. SOTO, Justice

April 28, 2023

Before Rodriguez, C.J., Palafox, J. and Soto, J

---

[18] We note that Tidwell testified to an incident in which she believed her supervisor was upset with her for failing to turn in a budget report in a timely manner while she was on her modified job assignment, but she was not disciplined for that incident.